UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA     )
                                 )
           vs.               )       CAUSE NUMBER 3:10cr56RM
                                 )
JAMES A. SIMON             )

OPINION AND ORDER

James Simon is under indictment on four counts of filing false income tax returns, 26 U.S.C. § 7206(1), four counts of failure to file reports of foreign bank and financial accounts, 31 U.S.C. §§ 5314 & 5322, eleven counts of mail fraud involving private financial aid, 18 U.S.C. § 1341, and four counts of fraud involving federal financial aid, 20 U.S.C. § 1097. The charges revolve around the government's allegation that Mr. Simon and his wife received what were purported to be loans from organizations with which he was affiliated, and treated that money as personal income that he did not report on his personal income tax returns for the calendar years 2003 to 2006, and concerning which he filed no reports of foreign bank and financial accounts for the calendar years 2004-2007, and that he didn't include in applications for need-based financial aid from two private schools for his children. Mr. Simon has pleaded not guilty to each of the charges.

On September 28, the court heard argument on five motions by Mr. Simon: a motion for disclosure of grand jury transcripts, which is now moot; a motion to suppress and for a <u>Franks</u> evidentiary hearing; a motion for a bill of particulars; a motion to dismiss the counts relating to reports of foreign bank accounts; and

a motion to dismiss the indictment based on tainted grand jury proceedings. Some of the motions are based on multiple grounds. For the reasons set forth in this opinion, the court denies each of the motions, except for the motion to suppress based on the manner of the search warrant's execution and the delay in returning seized material. The court also grants the government's motion to exclude expert testimony concerning the reasonableness of the application for the warrant based on Internal Revenue Service policies.

I

The court begins with the motion to suppress. On November 2, 2007, Internal Revenue Service Special Agent Paul Muschell submitted a search warrant affidavit to United States District Judge Theresa Springmann, who authorized the search of the Simon residence. On either November 4 or November 6 (the parties' submission disagree about the date the warrant was executed, but the date isn't pertinent to the issues now before the court), thirteen agents conducted a search of the Simon residence from around 7:30 a.m. to around 5:00 p.m. Denise Simon, Mr. Simon's wife, was present when the agents arrived. She called her husband and asked that her attorney be allowed to attend the search. Her attorney, Robert Nicholson, arrived about an hour later. The agents seized computers, computer-related devices, and financial documents; some computer-related items were imaged at the Simon home and left there.

A few days after the warrant was executed, Mrs. Simon died at her own hand.

Mr. Simon argues that all evidence obtained as a result of the search of his home and seizure of financial records, computers and other documents, and all derivative evidence should be suppressed because it was obtained in violation of his Fourth Amendment rights. Mr. Simon's motion to suppress is one of the motions based on a variety of arguments. Mr. Simon says:

- Special Agent Muschell's affidavit contained false and misleading statements of fact and omitted facts that were material to the probable cause finding;

- The affidavit didn't establish probable cause for the offenses listed;

- the search warrant lacked sufficient specificity, and resulted in a "general search" of the Simon residence, in violation of the 4th Amendment;

- the warrant was unreasonable because it authorized intrusion into the defendant's residence and was issued contrary to guidelines contained in the Internal Revenue Service manual for search and seizure; and

- the warrant was executed in an unreasonable manner (agents exceeded scope of the warrant and seized unauthorized items).

The government agrees that an evidentiary hearing is needed with respect to the reasonableness of the warrant's execution. Mr. Simon seeks an evidentiary

hearing concerning the statements and omissions in the affidavit and also seeks to present evidence concerning the IRS manual for search and seizure.

## A

A court evaluating probable cause asks if there was a fair probability, given the totality of the circumstances, that evidence of a crime would be found in the place to be searched. United States v. Orozco, 576 F.3d 745, 748 (7th Cir. 2009); *see also* United States v. Walker, 237 F.3d 845, 850 (7th Cir. 2001) ("a practical, common-sense decision"). The supporting affidavit must set forth enough facts to lead a reasonably prudent person to believe that the requested search will find evidence of a crime. United States v. Romo, 914 F.2d 889, 898 (7th Cir. 1990). The affidavit is reviewed in a common sense manner, not hypertechnically. United States v. Walker, 237 F.3d at 850.

"The Fourth Amendment requires an evidentiary hearing on the veracity of a warrant affidavit, and ultimately on the constitutionality of the search, when a defendant requests such a hearing and 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause.'" United States v. Harris, 464 F.3d 733, 738 (7th Cir. 2006) (*quoting* Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). "A defendant may also challenge an affidavit by showing that the affiant intentionally or recklessly omitted material information." Id.; *see also*

<u>Shell v. United States</u>, 448 F.3d 951, 958 (7th Cir. 2006); <u>United States v.</u> <u>Williams</u>, 737 F.2d 594, 604 (7th Cir. 1984). "[T]o make a substantial preliminary showing, the defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the defendant should submit sworn statements of witnesses to substantiate the claim of falsity." <u>Id</u>.; *see also* <u>Franks v. Delaware</u>, 438 U.S. at 171. A court then considers the affidavit, eliminating any false statements and incorporating omitted material facts, and determines whether probable cause existed. <u>United States v. Harris</u>, 464 F.3d at 738.

1

Discussion of Mr. Simon's attacks on the affidavits requires the court to recite an unfortunate degree of detail. Some of what Special Agent Muschell related in the affidavit related to what he has learned about tax offenders and their ways during his years as an IRS agent and as an accountant before that. He explained that tax offenders often use offshore entities, offshore trusts, foreign shell corporations, and foreign bank accounts, that sham loan transactions (those in which the borrower isn't really obligated to repay the loan) often are used to hide income, that tax offenders often use "tax haven" countries that are deemed "tax havens" because of their bank secrecy laws, like Cyprus, Gibraltar, and the Cook Islands, and that tax offenders often add layers to the scheme to try to make it harder to trace funds. Agent Muschell then explained computer terminology and

how tax offenders are known to have used computers, and added that it can take weeks to find financial information in computers.

The affidavit then turned to James and Denise Simon, who were affiliated with several domestic entities, foreign trusts, foreign shell entities, and offshore bank accounts, some of which were established in countries earlier identified as "tax havens". The affidavit reported that the Simons sent funds to offshore countries, then transferred the funds back into domestic bank accounts, with funds eventually winding up in Denise Simon's checking account. The affidavit also reported that the Simons received mail at an address in Huntertown, Indiana, and transferred mail to their residential address.

The affidavit says Mr. Simon transferred personal assets to the Simon Family Trust, located in the Cook Islands for the benefit of his family. The trustees were an attorney named Doug Miller and a Cook Islands firm. The family trust contained a 99 percent interest in JAS Partners, and contained about $4 million in 2000. Although required to file tax returns, the family trust hadn't done so from 2004 through 2006, during which years the Simons prepared their own personal and business tax returns. Special Agent Muschell's affidavit said Mr. Simon was president of William R. Simon Farms, Inc., which he and his family inherited when his mother died. That corporation owned two properties in Huntertown, Indiana; the Simons received mail at one of the properties and Mrs. Simon was seen obtaining an envelope from that property. Mr. Simon signed the corporation's tax returns of the Farm in 2000, 2001, and 2004, but the corporation didn't file a

return for 2002, 2003, 2005, and 2006. According to the affidavit, Mr. and Mrs. Simon received farm subsidy income from the corporation in those years.

The affidavit reported that Mr. Simon is the managing director and Denise Simon is an authorized representative of JS Elekta Leasing, an international telecommunications corporation based in Cyprus. Mr. and Mrs. Simon opened, and were the only authorized signers on, a bank account for J.S. Elekta Leasing Limited. Agent Muschell said Mr. Simon had received funds from investors on behalf of JS Elekta Leasing's behalf since 2002, and that JS Elekta Leasing had never filed a tax return.

The affidavit said the Simons had formed JAS Partners in 1981 in Colorado through attorney David Lockwood, who specializes in "achieving estate tax minimization and probate avoidance." Mr. Simon was quoted as saying JAS Partners was a "vehicle that engages in financial transactions: loans, money, et cetera, for the purpose of economic gain." JAS Partners reported little revenue, but significant business expenses and net losses from 2000 to 2005. The partnership's losses flowed through to the Simons' tax returns, so they reported adjusted gross incomes of -$37,364 in 2003, $5,130 in 2004, -$269,922 in 2005, and -$47,119 in 2006. Because of (and only because of) the partnerships' losses, the affidavit reported, Mr. and Mrs. Simon received earned income tax credits in 2003-04 and 2006, to which they would not have been entitled had they correctly reported their income. Special Agent Muschell's affidavit says Mrs. Simon's checking account received more than $500,000 in 2006 that came from companies affiliated with

Mr. Simon. Some of these wire transactions referenced payment for "services," but those payments weren't reported as income.

The affidavit reported that Mr. Simon is the president and self-described managing director for Elekta Limited, which is based in Gibraltar and hasn't filed any tax return with the IRS. Mr. and Mrs. Simon opened, and were (along with Mr. Simon's sister) authorized signers on, an Elekta Limited bank account in 1997. In 2006, Mr. Simon transferred $2,700 from the Elekta Limited account to a Gibraltar company that specializes, inter alia, in "international tax and asset protection planning."

Mr. Simon, the affidavit continued, also was chief executive officer of Intellecom, the parent company of which is Ichua Limited, located in Cyprus. The affidavit reports that Mr. Simon, acting on Ichua Limited's behalf, had wired $417,000 in 2006 and 2007 to accounts the Simons controlled, and that most of that money went into Mrs. Simon's checking account. The Simons didn't disclose on their 2003 to 2005 tax returns that they had any interest in a foreign financial account, and from 2003 to 2006, didn't file Reports of Foreign Bank and Financial Accounts ("FBARs") disclosing their interest in foreign financial accounts.

Ichua Limited wired more than $270,000 to JS Elekta Leasing Limited in 2006 (referencing "services") and more than $370,000 to Elekta Limited which, in turn, wired more than $370,000 to JAS Partners, which transferred more than $350,000 to the personal bank account of Mrs. Simon, who also got more than $190,000 from Elekta Limited. Mrs. Simon, the affidavit says, spent between

8

$34,000 and $120,000 per month in 2006, but the Simons reported total income of -$40,499.

Based on this affidavit, Judge Springmann found probable cause to issue a search warrant to look for financial records and other evidence of tax offenses in the Simon residence.

2

The court agrees with the government and Judge Springmann that Special Agent Muschell's affidavit established probable cause for the requested search. The affidavit set forth enough facts to lead a reasonable person to believe that the search of the residence would produce evidence that Mr. and Mrs. Simon had filed tax returns that were false because they omitted taxable income, and that Mr. and Mrs. Simon were required to file "FBARs" that they hadn't filed.

Most of Mr. Simon's arguments to the contrary intertwine with his separate argument for a <u>Franks</u> hearing, making it difficult to isolate his arguments about the insufficiency of the affidavit as written. Essentially, Mr. Simon contends that the affidavit's factual allegations don't establish each element of tax evasion. This was not an affidavit for an arrest warrant, though. It sought a warrant to search the Simon residence for evidence of tax evasion and failure to comply with reporting requirements concerning foreign bank accounts. Setting aside for the moment the facts that Mr. Simon contends were missing or were false, Special

Agent Muschell's affidavit contains more than enough facts to support a finding of probable cause for the requested search.

## 3

Mr. Simon contends that Special Agent Muschell's affidavit contained false and misleading statements of fact and omitted material facts. He seeks an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), to pursue that inquiry. As already noted, Mr. Simon must make a substantial preliminary showing that Special Agent Muschell made one or more false statements knowingly, intentionally, or with reckless disregard for the truth, and that the false statement was necessary to the finding of probable cause. <u>United States v. Harris</u>, 464 F.3d at 738.

Mr. Simon says two of the statements in the affidavit were false: Cyprus has a tax treaty with the United States and doesn't have bank secrecy laws, so it isn't a "tax haven" as Special Agent Muschell defined the term; and the Simon Family Trust, described as being located in the Cook Islands, actually is a domestic trust.

Mr. Simon says the affidavit omitted the following facts: that Mr. Simon lived overseas and has business operations in foreign countries; that neither Mr. nor Mrs. Simon had any criminal history; that Mr. and Mrs. Simon had been audited in the past, and had cooperated with the IRS and resolved the audits successfully; that the Simon Family Trust's assets were held in domestic financial institutions, not in the Cook Islands; that a person could have legitimate reasons

for using offshore bank accounts; that the Simon Family Trust's trustee's address was in the United States, and the Trust was involved in litigation in the United States, so it had submitted to the jurisdiction of an American court; that the Family Trust's trustee, rather than Mr. and Mrs. Simon, was required to file tax returns for the trust; that the Simons' personal tax returns included income generated by the Family Trust; that the farm subsidies to William R. Simon Farms, Inc., in 2000, 2001, and 2004, were less than $5,000, and that the farm historically had shown losses on its tax returns; that J.S. Elekta Leasing, Ltd. and Elekta Limited might not be required to file tax returns; that taxable income is different than revenues and JAS Partners might have received nontaxable sources of income, such as loans; and that while Elkta, Ltd. received payments from services from Ichua, Ltd., Mrs. Simon and JAS Partners didn't receive payments for "services."

4

The omissions of which Mr. Simon complains relate to matters that might, if included, make the inculpatory facts look less suspicious. For example, the Simons' use of offshore accounts seems less sinister if the reader also learns that there can be innocent reasons for using offshore accounts. But the Fourth Amendment doesn't require that an applicant for a search warrant include all facts that could support an innocent explanation for the apparently less innocent facts recited in the affidavit. United States v. Rambis, 686 F.2d 620, 623 (7th Cir

1982) (affidavit "need only allege specific facts establishing a reasonable probability that the items sought are likely to be at the location designated; [it] need not also negate every argument that can be asserted against that probability."); *see also* United States v. Carmel, 548 F.3d 571, 577 (7th Cir. 2008) (affidavit described illegal use for object but omitted reference to a legal use for the same object; Franks hearing properly denied); United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)("The fact that an innocent explanation may be consistent with the facts alleged...does not negate probable cause.").

Nothing in Mr. Simon's submission suggests that the omitted facts go so far past the "innocent explanations" that needn't be included that Special Agent Muschell could be said to have omitted the specified facts "knowingly or intentionally, or with reckless disregard for the truth . . .." Franks v. Delaware, 438 U.S. at 155-156.

That leaves the two statements that Mr. Simon says were false: that Cyprus is a "tax haven," and that the Simon Family Trust is located in the Cook Islands. First, the record contains precious little to support a finding that either statement is wrong. *See* United States v. Souffront, 338 F.3d 809, 823 (7th Cir. 2003) ("The presumption of validity [of the affidavit] cannot be overcome by defendant's self-interested inferences and conclusory statements."); *see also* Shell v. United States, 448 F.3d 951, 958 (7th Cir. 2006) (denying Franks hearing where defendant offered no support for the contention that the agent intentionally omitted information). The more important point is that even if those statements

are disregarded, the affidavit contains more than enough factual information to lead a reasonable person to believe evidence of the specified criminal activities would be found at the Simon residence. The alleged omissions aren't material to the probable cause finding. *See* <u>United States v. Klump</u>, 536 F.3d 113, 120 (2d Cir. 2008) (omission not material where innocent explanation doesn't negate probable cause); <u>United States v. Harris</u>, 464 F.3d at 738 (innocent explanation didn't materially detract from the totality of probable cause found in the affidavit); <u>United States v. Maro</u>, 272 F.3d 817, 821 (7th Cir. 2001) (unimportant allegation, even if viewed as intentionally misleading, doesn't trigger need for a <u>Franks</u> hearing).

5

Special Agent Muschell's affidavit supported a finding of probable cause to search the Simon residence, and Mr. Simon hasn't made a showing sufficient to support his request for a <u>Franks</u> hearing. To the extent the motion to suppress is based on those arguments, it must be denied.

B

Mr. Simon contends that the search warrant was overly broad and had insufficient specificity. The warrant had two attachments. The first attachment described and depicted the Simon residence. The second (Attachment B) set forth the items to be seized: (1) business records and correspondence related to

Intellcom, Ichua Limited, Elekta Limited, JS Elekta Leasing, JAS Partners, Ltd., Fort Wayne Telstat, and Klondike Data Services from 2000 through 2006; (2) state and federal tax returns, and related forms and schedules, from 2000 through 2007; (3) documents related to domestic and foreign travel; (4) financial records showing the obtaining and concealing of assets and the expenditure of money; (5) photographs of real or personal property; and (6) indicia of occupancy. Attachment B authorized the agents to seize computers and electronically stored information, making every effort to image the information on site, but allowing seizure for enough time for off-site access and copying.

Mr. Simon contends that Attachment B's descriptions of items to be seized didn't satisfy the Fourth Amendment's particularity requirement. The description "all business records" didn't limit the seizure authority to evidence of violations of the statutes in the application, giving the agents unfettered discretion rather than providing specific guidance. *See, e.g.*, <u>United States v. Cardwell</u>, 680 F.2d 75 (9th Cir. 1982), *citing* <u>Marron v. United States</u>, 275 U. S.192, 196 (1927); <u>Alioto v. United States</u>, 216 F.Supp. 48 (E.D. Wis. 1963) (warrant was overbroad when only limitation on seizure of business records was that they be instrumentalities or evidence of violation of general conspiracy and tax evasion statutes). With respect to tax returns and financial documents, the warrant wasn't limited to any person or entity. The same was true with respect to records of foreign or domestic travel and photos, which weren't even limited to a particular time period. As a result, Mr. Simon argues, agents seized documents beyond those authorized by

the warrant, such as records of financial aid from the schools his children attended.

A warrant satisfies the particularity requirement if the warrant tells a reasonable executing officer what items are to be seized. United States v. Hall, 142 F.3d 988, 996 (7th Cir. 1998). The particularity needed in one case might be impossible in another, so the courts recognize that the requisite specificity varies from case to case, depending on the complexity of the suspected criminal activity. *See* Russell v. Harms, 397 F.3d 458, 464 (7th Cir. 2005); United States v. Vitek Supply Co., 144 F.3d 476, 481 (7th Cir. 1998); Wag-Aero, Inc. v. United States,837 F. Supp. 1479, 1496 (E.D. Wis. 1993). The description in the warrant must be as particular as the circumstances reasonably permit, United States v. Bentley, 825 F.2d 1104, 1110 (7th Cir. 1987), allow so that an executing officer can identify the things to be seized with reasonable certainty. United States v. Jones, 54 F.3d 1285, 1290 (7th Cir. 1995). Generic language is allowed if detailed particularity is impossible and the language used particularizes what is to be seized. United States v. Hall, 142 F.3d at 996.

This warrant listed the Simons' business affiliations and limited the records search concerning those businesses to a particular time frame. It specified tax documents within a particular time frame. The other categories of items are limited by subject matter rather than by time frame. Greater specificity would be needed for a search of an accountant's office, but this warrant related to a residence.

Seizure of the financial aid documents neither exceeded the warrant's scope nor demonstrated an impermissible lack of particularity. The financial aid applications contained information from the Simons about taxable income, expenses, and loans, and included copies of tax returns. The warrant specified evidence of the obtaining and concealment of assets by Mr. and Mrs. Simon, and the financial aid documents appear to fall within that category of items.

C

Mr. Simon argues that the execution of the search warrant was unreasonable, among other reasons because the agents departed from the IRS' administrative guidelines on search warrants. Mr. Simon's argument, though, addresses the decision to obtain a warrant and the adequacy of Special Agent Muschell's affidavit, rather than the execution of the search itself. Mr. Simon notes, for example, that section 9.4.9.2 of the Internal Revenue Manual says "CID will employ the least intrusive means necessary to acquire evidence in tax and tax-related Title 18 investigations," and that search warrants are to be used when crucial evidence "cannot be obtained by any other means." Special Agent Muschell used the search warrant rather than using IRS summonses and/or grand jury subpoenas, or simple requests. Sections 9.4.9.2 and 9.4.9.3.1.2 of the IRS manual say that an affidavit for a warrant must show "objective evidence of the subject's attempt to obstruct the investigation", or "objective evidence indicating the subject may destroy the evidence", or "facts that establish that other attempts to acquire

the records were ineffective." Special Agent Muschell's affidavit made no such references.

A search warrant obtained in contravention of the IRS manual, Mr. Simon argues, is unreasonable. This is especially so since the warrant was directed at the Simon residence, in which he and his family had the highest degree of privacy. There would have been no search had the manual been followed, because the government would have employed less intrusive means of investigation first.

The court doesn't understand the law the same way Mr. Simon does. Mr. Simon cites no authority for the proposition that investigators must proceed incrementally by using the least intrusive investigative means before moving to the next stage of their investigation. The IRS might have internal procedures to that effect, but those procedures confer no rights on the person being investigated. United States v. Peters, 153 F.3d 445, 452 n.9 (7th Cir. 1998). The search warrant was based on probable cause and described the place to be searched and the items to be seized with sufficient particularity. Recognizing that the court defers ruling on the reasonableness of the warrant's execution until after hearing evidence, the Fourth Amendment requires no more.

That the Simon residence was the place to be searched doesn't change the analysis. No heightened standard of probable cause or reasonableness governs residential searches pursuant to search warrants. See, e.g., United States v. Jones, 54 F.3d 1285, 1289-1290 (7th Cir. 1995); United States v. Stone, 471 F.2d 170, 175 (7th Cir. 1972).

During argument on Mr. Simon's motion, the government moved to exclude the presentation, at the hearing concerning the method of execution of the warrant, of any expert testimony that the search and/or warrant did or didn't comport with the manual. Because the manual doesn't provide the yardstick by which reasonableness is judged for Fourth Amendment purposes, the court grants the government's motion.

### D

Special Agent Muschell's affidavit supported a finding of probable cause to search the Simon residence, and Mr. Simon hasn't made a showing sufficient to support his request for a <u>Franks</u> hearing. The warrant described with sufficient particularity the things to be seized, and the search was not made unreasonable by any failure to comply with the IRS manual. The court has deferred ruling on the aspect of Mr. Simon's motion that argues for suppression based on the execution of the warrant and retention of items seized; in all other respects, the motion to suppress is denied.

### II

The court heard argument on the pending motions on September 28, Mr. Simon asked to submit supplemental authority on a couple of points, and the court afforded both sides until October 1 to file supplementary material. On October 5, as the court was drafting this opinion and after the court already had

completed the section concerning the motion for a *Franks* hearing (this opinion would have been released a day earlier but for a gas leak that caused evacuation of an area of South Bend that includes the federal courthouse), Mr. Simon filed a motion for leave to file the affidavit of retired IRS agent George Scott in support of his motion to suppress. Mr. Simon explained that he didn't believe such an affidavit was required for his suppression motion, but the arguments at the hearing suggested the government disagreed. The government objected to Mr. Simon's motion to file the Scott affidavit.

The court has resolved the suppression motion (save issues concerning the warrant's execution) without relying on (though not without commenting on) the lack of an affidavit. Mr. Scott's affidavit wouldn't affect that ruling if the affidavit (as the court assumes) is limited to the issues previously raised. If the affidavit raises any new issues, it comes too late. In either event, there is no need to expand the record with Mr. Scott's affidavit, so the court denies Mr. Simon's motion to file the affidavit.

III

Mr. Simon asks the court to order the government to file a bill of particulars pursuant to FED. R. CRIM. P. 7(f) as to the amount of unreported income allegedly received from each of the entities referenced in ¶ 3 of the indictment for each tax year in question, and requiring an itemized statement of all of the expenditures alleged in ¶ 7 of the indictment (including dates, amounts and payee of each

expenditure). The government responds that the indictment sufficiently alleges the elements of the offenses charged and provides significant detail regarding the source of the implicated funds and the manner in which they were spent, and that it's "open-file" discovery obviates the need for a bill of particulars in this case.

The motion deals with paragraphs 3 and 7 of the tax counts (counts 1-4), The indictment is unusually rich in detail with respect to the tax counts. After alleging ¶ 2 that Mr. Simon was involved with Elekta Limited, JS Elekta Leasing Limited, Ichua Limited, JAS Partners, and William R. Simon Farms, Inc., the indictment alleges in ¶ 3 specific annual amounts of money Mr. Simon and his family are said to have received from the entities listed in ¶ 2:

> 3.    From 2003 through 2006, Simon and/or his family received approximately $1,799,502.60 from Elekta Limited, JS Elekta Leasing Limited, Ichua Limited, JAS Partners, and William R. Simon Farms, Inc., as follows: $245,800 in 2003; $341,143.71 in 2004; $472,637.96 in 2005; and $739,920.93 in 2006.

Paragraph 4 alleges that Mr. Simon didn't report the $1,799,502.60 as income on his tax returns. Paragraphs 5 and 6 allege that Mr. Simon's personal accounting records referred to most of the money as "loans" or "advances," but set forth about eleven reasons why the money wasn't loaned or advanced.

Paragraph 7 then alleges, with striking specificity, how Mr. Simon and his family spent most of the money from those entities from 2003 to 2006, breaking the expenditures down into 31 categories, with 14 sub-categories.[1] The

---

[1] Actually, one of those categories is "uncategorized." The rest are accounting fees, ATM & cash withdrawals, automobile, bank charges, boat, clothing, "Person One," "Person Two," computer, contributions, education, entertainment, gifts, hair care, household, insurance,

expenditures are alleged down to the penny; for example, the indictment alleges that Mr. Simon and his family spent $5,054.18 on make-up from 2003 to 2006.

This indictment, in other words, is a far cry from the usual allegation that a defendant, together with others known and unknown, conspired to distribute cocaine base in excess of 50 grams in 2007 and 2008 within the Northern District of Indiana and elsewhere.

Mr. Simon seeks still greater detail. He notes that ¶ 3 doesn't specify how much allegedly unreported income was received from each entity, either in total or for each tax year in question. Without that information, he says, he won't be able to prepare a defense to these allegations. With respect to the expenditures collected in ¶ 7, Mr. Simon says the Government should itemize each transaction, the dates thereof, and the payees, so he can investigate. Mr. Simon says the Government had produced more than 40,000 pages of documents by the time he filed his motion (more pages were produced at the hearing), but hasn't provided any kind of index, categorization, or organizational aid. Mr. Simon believes it would be grossly unfair and prejudicial to leave it to him to go through so much discovery without the detailed schedule of all of the expenditures that the government already must have prepared.

---

interest, legal fees, make-up, medical, miscellaneous, office supplies, photography, postage, rent, service charges, subscriptions, taxes, telephone, and travel.

The "education" category is subdivided into School One, School Two, School Three, lessons, summer camp, and other.

The "household category is subdivided into carpet cleaning, decorating, flowers, furniture, groceries, improvements/ repairs, lawn care, mortgage, supplies, utilities, and other.

A bill of particulars is not designed to help a defendant organize discovery materials; a bill of particulars helps clarify a minimally sufficient indictment so that a defendant might understand the nature of the charge against him. *See* United States v. Fassnacht, 332 F.3d 440, 446-447 (7th Cir. 2003); United States v. Kendall, 665 F.2d 126, 134 (7th Cir. 1981) ("The test for whether a bill of particulars is necessary is 'whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial.'"). This indictment provides more than enough information to inform Mr. Simon of the charges and to allow him to prepare to defend those charges. Moreover, the government is correct that a bill of particulars is even less necessary when, as here, the government provides open file discovery. United States v. Canino, 949 F.2d 928,949 (7th Cir. 1991); United States v. Giese, 597 F.2d 1170, 1180 (7th Cir. 1979).

The court denies Mr. Simon's motion for a bill of particulars.


IV

Mr. Simon moves to dismiss the indictment in its entirety on two grounds related to the grand jury. He contends the grand jury proceedings in this case were tainted because Special Agent Muschell gave misleading and false information to the grand jury and because the prosecutor gave misleading, confusing and inaccurate information to the grand jury, and didn't clarify and/or

answer questions posed by the grand jury. He also seeks dismissal because the prosecutor excused a grand juror without court approval.

A

Mr. Simon contends that Special Agent Muschell led the grand jury to believe that $1.7 million had come into Mr. Simon's personal checking account, that Mr. Simon received transfers from the affiliated entities on a regular basis from 2003 to 2006, that Mr. Simon "did not report virtually any income" during those years, that the money was spent primarily on tennis lessons, that Mr. Simon had personally prepared affidavits for witnesses to sign, that money that actually went to affiliated entities went directly into Mr. Simon's checking account, that money "bounced around" before settling in Mr. Simon's bank account, that Mr. Simon pocketed "half" of the money investors were putting into the affiliated entities, and that no loan documents (or payments on the loans) were ever made. Mr. Simon believes the prosecutor misled the grand jury with respect to whether loans from certain people would be the basis of charges the grand jury was considering, whether loan documentation existed, whether promissory notes would be evidence of loans, and about a lawsuit Mr. Simon had filed against Special Agent Muschell and the IRS (relating to the search of his home and his wife's death).

To the extent Mr. Simon contends the indictment rested on false testimony, he must show (1) that the grand jury heard false testimony and (2) prejudice

amounting to either "proof that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it." United States v. Useni, 516 F.3d 634,656 (7th Cir. 2008); United States v. Anderson, 61 F.3d 1290, 1296 (7th Cir. 1995). Mr. Simon hasn't met that burden. There might be a factual dispute between the parties with respect to documents that purport to be loan documents, but that's a matter for trial, not pretrial motion practice. None of the transcripts to which Mr. Simon points demonstrate that either the prosecutor or Special Agent Muschell made any false statements, or that the prosecutor failed to answer (or refused to allow) the grand jurors' questions.

Mr. Simon's complaints seem to rest instead on what he sees as skewed or slanted testimony and responses to grand jurors' questions. In presenting such an argument, Mr. Simon shoulders a heavy burden. A grand jury is an accusatory body rather than an adjudicatory body, United States v. Mahalick, 498 F.3d 475, 479-480 (7th Cir. 2007), so its proceedings can't be judged by the same yardstick that applies to trials. The government isn't required to disclose even the existence of exculpatory evidence to the grand jury, United States v. Williams, 504 U.S. 36, 53 (1992), or to provide instructions about material facts or legal terms. United States v. Lopez-Lopez, 282 F.3d 1, 8-9 (1st Cir. 2002). The federal courts "have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure. Over the years, we have received many requests

24

to exercise supervision over the grand jury's evidence-taking process, but we have refused them all . . .." United States v. Williams, 504 U.S. at 50.

In United States v. Hogan, 712 F.2d 757, 760 (1st Cir. 1983), the prosecutor called the target a "hoodlum" who should be indicted as a matter of equity, presented hearsay testimony about unrelated murders of which the target was suspected, recounted news accounts and rumors suggesting that the target had taken bribes while a police officer, presented speculative testimony about why the target hadn't engaged in a drug deal with an informant, and presented concededly false testimony about someone overhearing the target discussing a heroin deal in a phone call. Mr. Simon's complaints about the conduct before the grand jury that indicted him fall well short of that conduct. The parties have cited no other instance in which a federal court upheld an indictment's dismissal for prosecutorial misconduct falling short of actual false testimony, and the court's research has found none. *Cf.* United States v. Feurtado, 191 F.3d 420 (4th Cir. 1999) (upholding district court's dismissal of indictment without prejudice, rejecting appellants' contention that indictment should have been dismissed without prejudice).

At the hearing on his motion, Mr. Simon indicated that he wanted to be able to question Special Agent Muschell at a hearing to learn why answers were framed as they were. The court invited Mr. Simon to file supplemental citation of authority to support the proposition that a defendant is entitled to an evidentiary pretrial hearing to question a grand jury witness about why answers were phrased in

certain way, or why certain information wasn't given. No authority was submitted, and the court knows of none. The court won't allow such questioning.

B

One of the grand jurors reported that he or she had attended Mrs. Simon's funeral. The Assistant United States Attorney told the grand juror:

> In situations like this, what we typically do assuming we have enough grand jurors, which we do is ask someone who would be that familiar with that situation to excuse themselves from the deliberations. So I guess what you can do is you can step out and so you won't need to be involved in the deliberations on this particular case hearing more testimony or deliberating because of your sort of personal knowledge and relationship with the family or in-laws or that sort of thing.

Grand jurors inquired whether that grand juror, who had been an active questioner to that point (this was an active grand jury with respect to questions), could remain to ask questions of witnesses and then leave only for the deliberations; the foreperson of the grand jury asked the grand juror to step out before the witnesses were called. Another grand juror reported an acquaintance with the Simon family: the grand juror taught tennis to the Simon children, and the Simons were neighbors of the grand juror. The prosecutor made no suggestion that this second grand juror should recuse.

Based on these exchanges, Mr. Simon contends that the prosecutor improperly suggested that the grand juror excuse himself, although that grand juror was (in Mr. Simon's estimation) asking the best questions about Mr. Simon's

financial matters and seemed to have the most insight into Mr. Simon' position with respect to loans and taxable income. Mr. Simon moves the court, pursuant to its inherent supervisory power over the grand jury, to dismiss the indictment with prejudice.

Conceding the absence of any authority squarely on point, the government argues that a district court is not to inquire into grand jurors' bias after the grand jury has been selected, *see* United States v. Adamo, 742 F.2d 927,936 n.5 (6th Cir. 1984), and that district judges are to have very little involvement with grand jury matters after calling the grand jurors together and administering their oaths. United States v. Williams, 504 U.S. at 48-50. The government views Mr. Simon's argument — that the prosecutor should have brought the arguably tainted grand jurors before the court rather than advise the grand jury himself — as inconsistent with those principles.

The government's argument on this point is staggered, if not knocked out altogether, by Federal Rule of Criminal Procedure 6(h), which authorizes judges to excuse seated grand jurors, either permanently or temporarily. Whatever limits law or custom may place on judges' involvement with the grand jury's day-to-day operations, the Rule contemplates that judges will, at least occasionally, be called upon to decide whether to excuse a juror, even on a temporary basis. Given the terms of Rule 6(h), it doesn't appear that it would have been improper for the government to refer the grand juror's potential recusal to a judge.

But Rule 6(h) doesn't answer any more of the questions posed by Mr. Simon's motion, because it doesn't limit the authority to excuse a grand juror to the court. It simply vests the court with such authority without revealing whether anyone else shares the authority. It doesn't declare that the prosecutor can never excuse a grand juror with respect to a single matter, or that the foreperson or deputy foreperson can't do so, or that a grand juror can't recuse herself with respect to a particular inquiry. By the same token, it doesn't deny the authority to permanently excuse a grand juror to any of those people, but it seems improbable that the law contemplates either the prosecutor permanently barring a seated grand juror from the room, or a seated grand juror's authority to excuse himself from any further duty.

If the inquiry proceeded further, it would be difficult to identify precisely who had final responsibility for the grand juror's recusal on the grand jury's final day with this case. The prosecutor never told the grand juror that recusal was required, but since grand juries look to prosecutors for guidance on the law, the prosecutor's statement about what is "typically" done in similar situations might have been indistinguishable from a command. On the other hand, the grand juror seems to have had no disagreement with the course the prosecutor recommended, and the action might be seen as self-recusal. Modest precedent for a voluntary, but prosecutor-driven, recusal is found in United States v. Lopez, 854 F. Supp. 50, 54-55 (D.P.R. 1994) (AUSA said, "Mr. Foreperson, this is the case of Franklin Delano López. As in the past, we would request that you recuse yourself, and I

28

would request that the deputy foreperson assume his duties"; issue in case arose when deputy foreperson wasn't there). And as already noted, it was the foreperson who finally directed the grand juror to step outside.

The court needn't resolve either the factual issue or the threshold legal question about who can excuse a grand juror temporarily, because there is no authority for the premise of Mr. Simon's motion: that the court can dismiss an indictment if a grand juror was improperly excused from the proceedings and deliberations. A court can't dismiss an indictment for prosecutorial misconduct in grand jury proceedings if the misconduct didn't affect the defendant's substantial rights. Bank of Nova Scotia v. United States, 487 U.S. 250, 254-255 (1988).

Unlike a petit jury that requires a unanimous verdict, the government wasn't required to persuade any particular combination of grand jurors to obtain this indictment. The government had to persuade twelve or more grand jurors to indict, out of at least sixteen grand jurors in attendance. That the indictment was returned demonstrates that twelve or more voted to indict; the vote of the excused grand juror wouldn't have affected the outcome. Mr. Simon had no right to a particular composition of the grand jury; as has already been discussed, grand jurors may be excused temporarily, so that the grand jury's composition might differ from session to session. Indeed, one member of the grand jury that indicted Mr. Simon had missed an earlier session, and the prosecutor properly produced a transcript of evidence from that session (which included exculpatory witnesses)

for that grand juror to review. *See* <u>United States v. Lang</u>, 644 F.2d 1232 (7th Cir. 1981).

If the excusing of the grand juror from the proceedings amounted to misconduct by anyone, that misconduct didn't affect Mr. Simon's substantial rights. Dismissal is not appropriate. <u>Bank of Nova Scotia v. United States</u>, 487 U.S. at 254-255.

C

Mr. Simon also had moved for disclosure of grand jury transcripts to allow him to seek any further issues with what was presented to the grand jury or what occurred during the proceedings. Since then, the government provided quite a few transcripts. At the hearing, the court asked Mr. Simon if those transcripts made his motion moot; he responded that if he has all the transcripts the government has, his motion is moot. The government then informed the court that Mr. Simon has all the transcripts it has. The court deems the motion moot and denies it as such.

V

Counts 1 through 4 of the indictment allege that Mr. Simon violated 26 U.S.C. § 7206(1) by filing tax returns for the years 2003 through 2006 because they didn't report certain income for each of those years and because they didn't disclose certain foreign bank accounts. Counts 5 through 8 of the indictment

allege that Mr. Simon failed to file Reports of Foreign Bank Accounts — what the parties call "FBARs" for the years 2004 through 2007, and so violated 31 U.S.C.§§ 5314 and 5322. Mr. Simon moves to dismiss these counts because the IRS has extended any requirement for the filing of FBARs or any disclosure of them on tax returns and expressly made the extension retroactive, *see* Administrative Notice 2010-23, March 13, 2010; and Notice 2009-62, (August 31, 2009), and because Mr. Simon filed all FBARs that could have been required before the indictment.

31 C.F.R. § 24 (reports of foreign financial accounts) provides that:

> Each person subject to the jurisdiction of the United States having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship to the Commissioner of the Internal Revenue for each year in which such relationship exists, and shall provide such information as shall be specified in a reporting form prescribed by the Secretary to be filed by such persons [Form TD F 90-22.1] . . .

Under 31 C.F.R. § 27(c):

> Reports required to be filed by 103.24 shall be filed with the Commissioner of Internal Revenue on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year.

Mr. Simon argues that the IRS retroactively extended the filing deadline in § 27(c) (and the duty to disclose those accounts on tax returns) for (i) persons with no financial interest in a foreign financial account but with signature or other authority over that account, and (ii) persons with a financial interest in, or authority over, a foreign financial account in which the assets are held in a commingled fund, by Administrative Notice 2010-23 (March 13, 2010) and

Administrative Notice 2009-62 (August 31,2009). Such people now have until June 30, 2011 to file FBARs for all calendar years before 2010. Mr. Simon says he filed all of the FBARs that could have been required before his indictment on April 15,2010 and was in full compliance at the time, and that any earlier failure to file or disclose can't be the basis of any criminal violation of 26 U.S.C. § 7203.

As the government sees it, Mr. Simon doesn't qualify for relief under the IRS notices because he had a financial interest, not just signature authority, in the foreign accounts. Even if he did qualify, the government argues, administrative relief can't change any criminal liability incurred before amendment of the regulation. The government further contends that the notices haven't become final regulations under the Administrative Procedures Act, and that Congress didn't expressly grant retroactive rule-making authority to the Treasury Department under Title 31. Mr. Simon's January 2010 filing of FBARs for 2005-2007, the government says, doesn't absolve him of criminal liability because under the regulations existing at the time the FBARs had to be filed by June 30 of the following year (June 30 of 2006, 2007, and 2008). The government also notes that Mr. Simon never filed an FBAR for 2003 or 2004.

In reply, Mr. Simon argues that he doesn't have a financial interest in Ichua, JS Elekta or Elekta, that 31 C.F.R. § 103.55 gives the Treasury Secretary authority to make exceptions to the reporting requirements, that the exceptions made by the administrative notices were expressly retroactive, and that he wasn't

required to file a FBAR for 2004 because the account balance was less than $10,000. No documentation supports his factual assertions.

Whether Mr. Simon had a financial interest in a foreign account is a matter for resolution at trial, not on pretrial motions. The court agrees with the government, though, that if Mr. Simon committed a crime by failing to file an FBAR when the regulations required him to do so, a later regulatory amendment can't absolve him of criminal liability without retroactive modification of the underlying statute. See <u>United States v. Hark</u>, 320 U.S. 531 (1944); <u>United States v. Uni Oil, Inc.</u>, 710 F.2d 1078, 1086 (5th Cir. 1983); <u>City & County of Denver v. Bergland</u>, 695 F.2d 465, 480 (10th Cir. 1982); <u>United States v. Resnick</u>, 455 F.2d 1127, 1134 (5th Cir. 1972); <u>United States v. Masciandaro</u>, 648 F. Supp. 2d 779, 784 (E.D. Va. 2009). The statute hasn't been changed.

Mr. Simon argues that the government is mistaken because none of these cases (or the several others the government cites) involved expressly retroactive regulations. Mr. Simon's description of the cited cases is accurate, but the court disagrees with Mr. Simon as to where that distinction leads. To agree with Mr. Simon that a regulation's self-declaration of retroactivity requires a different outcome would be to hold that an agency acquires the power to forgive crimes already committed by simply declaring its intent to exercise that power. The cited cases teach that even if an agency's regulations becomes intertwined in a crime's definition, it is Congress and not the agency that creates the crime, and only Congress can forgive the crime. See also <u>United States v. U.S. Coin and Currency</u>,

401 U.S. 715, 737-38 (1971); <u>Allen v. Grand Central Aircraft Co.</u>, 347 U.S. 535, 553-555 (1954); <u>United States v. Curtiss-Wright Export Corp.</u>, 299 U.S. 304, 332 (1936).

The court denies Mr. Simon's motion to dismiss counts 5 through 8 of the indictment.


## VI

For all of these reasons, the court:

1. DENIES the defendant's motion to suppress and motion for *Franks* hearing (Doc. No. 37) in all respects except for the issue of the manner of the warrant's execution and retention of items seized, hearing on which will be scheduled by a separate order;

2. GRANTS the government's oral motion, made at the September 28 hearing, to exclude the presentation, at the hearing concerning the method of execution of the warrant, any expert testimony that the search and/or warrant did or didn't comport with the IRS manual;

3. DENIES the defendant's motion for leave to file affidavit in support of his motion to suppress (Doc. No. 59);

4. DENIES the defendant's motion for bill of particulars (Doc. No. 35);

5. DENIES the defendant's motion to dismiss based on tainted grand jury procedures;

6. DENIES AS MOOT the defendant's motion for disclosure of grand jury transcripts; and

7. DENIES the defendant's motion to dismiss counts 5-8 relating to reports of foreign bank accounts (Doc. No. 36).

SO ORDERED.

ENTERED: __October 8, 2010__


_____/s/ Robert L. Miller, Jr._____
Robert L. Miller, Jr., Judge
United States District Court