UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA        )
                                )
        vs.                     )        CAUSE NO. 3:10-CR-00056(01)RM
                                )
JAMES A. SIMON                  )

<u>ORDER AND OPINION ON *BRADY* MOTION; SENTENCING FINDINGS</u>

For several years, James Simon supported his family with money taken from a variety of entities in which he had an ownership interest. During those years, he executed no loan documents with those entities, repaid none of the entities, and didn't report the money as income on either his federal tax returns or applications for financial aid for his children's schooling. He also failed to disclose on his tax returns that he had an interest in foreign bank accounts. A jury found Mr. Simon guilty of four counts of filing false federal income tax returns, 26 U.S.C. § 7206(1), three counts of failing to report foreign financial interests, 31 U.S.C. § 5314, six counts of mail fraud, 18 U.S.C. § 1341, and four counts of federal financial aid fraud, 20 U.S.C. § 1097.

Mr. Simon and the government filed a breathtaking range of objections to the presentence report. The court addresses each as the issues arise.

A sentencing court must first compute the guidelines sentence correctly, then decide whether the guidelines sentence is the correct sentence for that defendant. <u>United States v. Santiago</u>, 495 F.3d 820, 825 (7th Cir. 2007). The court applies the 2010 version of the sentencing guidelines. Before reaching the

sentencing objections, the court addresses Mr. Simon's most recent motion to dismiss.

*I. Motion to Dismiss Under Brady v. Maryland*

At trial, Mr. Simon's counsel requested and received a copy of a report prepared by IRS Special Agent Paul Muschell that contained a summary of the government's tax loss computations for the years 2003-2006. An appendix to that report (Appendix A) containing Special Agent Muschell's actual computations and notations wasn't included. One of the notations in the appendix provided:

> For purposes of computing Criminal Tax Due and Owing, all income and loss items flowing from JAS PARTNERS are not being considered. JAS PARTNERS was incorporated for the sole purpose of creating artificial business losses and disguising income as loans.

Mr. Simon made a post-trial motion for disclosure of *Brady* material for sentencing purposes [Doc. No. 143], seeking, among other things, the government's computation of tax harm. In response, the government argued that Brady v. Maryland, 373 U.S. 83 (1963), doesn't apply to its computations of tax loss because the computations weren't "favorable to the accused." *Citing* Mosley v. City of Chicago, 614 F.3d 391, 397 (7th Cir. 2010). Still, the government agreed to provide Mr. Simon with copies of those computations, which included Appendix A to the Special Agent Report produced at trial. Mr. Simon now contends that the agent's computations (and more specifically the notation just quoted) constitute exculpatory evidence that should have been produced before trial under Brady v.

<u>Maryland</u>, 373 U.S. 83. He now moves to dismiss all charges based on the government's alleged failure to provide the appendix[1]

To establish a <u>Brady</u> violation, a defendant must show: "(1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." <u>United States v. Roberts</u>, 534 F.3d 560, 572 (7th Cir 2008); <u>United States v. Baker</u>, 453 F.3d 419, 422 (7th Cir. 2006). Mr. Simon contends that: (1) the information contained in the appendix was exculpatory because it "revealed that the Government was taking inconsistent positions and that the concealed position was more favorable to the Defendant with respect to the taxability of funds issue;" (2) the government intentionally concealed and withheld that information when it produced the Special Agent's report without the appendix; and (3) the government's failure to disclose was prejudicial because "it precluded the defense from many avenues of cross examination and undermined its unsuccessful arguments at trial for the introduction of its evidence regarding the non-taxability of the funds."

The government renews its argument that <u>Brady v. Maryland</u> doesn't apply to Special Agent Muschell's computations of tax loss or the notations to those computations because the amount of loss isn't an element of the offenses with

---

[1] In closing argument at the sentencing/motion hearing on March 8, defense counsel argued for the first time that the government's production of the Special Agent's report at trial was also untimely, and requested leave to amend the motion to dismiss to include that allegation. The court denied the request as untimely.

which Mr. Simon was charged and wasn't material to the issues at trial or favorable to Mr. Simon. *Citing* <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985) ("the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial"). The government contends that it produced the bulk of the information in the computations during trial, although it wasn't required to do so, and that its position at trial wasn't inconsistent with the notations in Appendix A, or prejudicial to the defendant. It maintains that it didn't present any evidence or take any position with respect to the amount of loss at trial because the amount of the loss wasn't an element of the offenses charged and wasn't material to Mr. Simon's guilt, so Agent Muschell's computations and notations aren't covered by <u>Brady</u>. The government also contends that it's position was then, and is now, that money Mr. Simon received from JAS Partners was taxable income that should have been reported on his tax returns, and that Agent Muschell's computations and notations are consistent with that position. The court agrees.

Mr. Simon's counsel's suggestion that the court might have allowed Mr. Simon's experts to testify had the information in the appendix been disclosed before trial is unfounded. As noted in its opinion and order of January 3, 2011 denying Mr. Simon's third motion for acquittal and new trial [Doc. No. 139], the court repeatedly has considered and rejected Mr. Simon's arguments with respect to the admissibility of expert testimony, holding that an expert may provide an

opinion to help the jury understand the facts, but he can't give testimony stating ultimate legal conclusions based on those facts, or "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294 (2d Cir. 1991); *accord*, <u>Good Shepard Manor Found. Inc. v. City of Momence</u>, 323 F.3d 557, 564 (7th Cir. 2003) ("expert tetimony as to legal conclusions that will determine the outcome of the case is inadmissible"); <u>United States v. Sinclair</u>, 74 F.3d 753, 757-58 n.1 (7th Cir. 1996) ("Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case."); <u>Panter v. Marshall Field & Co.</u>, 646 F.2d 271, 294 n.6 (7th Cir. 1981) ("It is not for witnesses to instruct the jury as to applicable principles of law, but the judge."), and finds no basis for reconsidering those prior determinations now.

Mr. Simon's contention that the government's trial position was inconsistent with the comments in Appendix A ignores the second sentence of the quoted comment: "JAS PARTNERS was incorporated for the sole purpose of creating artificial business losses and disguising income as loans." The government consistently has taken the position that JAS Partners was created for the sole purpose of funneling funds from other corporate entities to Mr. and Mrs. Simon for their personal use under the guise of loans to avoid tax consequences. As the following discussion demonstrates, the government's position was amply

supported by the evidence presented at trial, and was known to Mr. Simon well in advance of trial.

Special Agent Muschell's computations of tax loss and how he arrived at those numbers weren't material to guilt or favorable to Mr. Simon and weren't subject to pretrial disclosure under Brady v. Maryland, 373 U.S. 83 (1963). *See* United States v. Bagley, 473 U.S. 667, 682 (1985) (evidence is material under Brady if there is a reasonable probability that had the evidence been disclosed, the result of the proceedings would have been different). Accordingly, the court denies Mr. Simon's motion to dismiss for failure to provide *Brady* material [Doc. No. 147].

## II. Facts of the Offenses

Mr. Simon was a principal of a dizzying array of corporations and partnerships — sufficiently dizzying that in testimony at the sentencing hearing, a director of two of the corporations seemed to confuse the names of two of the entities. Mr. Simon had a history of entrepreneurship, and was engaged in a telecommunications venture in Ukraine during the years at issue at trial. One of the entities, Ichua Ltd., solicited investments for that venture. Distinguished and respected people invested in Ichua and sat on its board of directors with Mr. Simon.

Money weaved through Ichua and a number of other entities that Mr. Simon controlled: JS Elekta Leasing Limited, Elekta Limited, JAS Partners, and William R. Simon Farms, Inc. Millions of those dollars wound up in the personal accounts

of James and Denise Simon, and were spent for personal expenses of the Simon family. The Simons didn't report any of that money as income on their federal income tax returns. In the bookkeeping of their personal accounts and the business accounts that they maintained, the Simons showed these payments as loans. None of the loans (other than one in 1997, which isn't at issue here) were repaid or memorialized by notes during the years in question.

Mr. Simon also had an interest — no more than signatory authority in some instances — in foreign bank accounts as a result of his involvement with these entities. He didn't disclose those interests on his tax returns and didn't file the required reports concerning those interests in a timely manner.

Mr. Simon obtained financial aid for his children to attend private schools — Culver Academies and the Canterbury School in Indiana and Mary Baldwin College in Virginia. When applying for that aid, Mr. Simon attached the federal income tax returns that omitted the millions of dollars that had been funneled to him and his wife through the entities, and also falsified reports of expenditures of those funds, such as vacations and other travel.

Mrs. Simon took her own life shortly after federal authorities executed a search warrant at the Simon home. Mr. Simon was indicted on four counts of filing false federal income tax returns, 26 U.S.C. § 7206(1), four counts of failing to file reports of foreign bank and financial accounts, 31 U.S.C. § 5314, eleven counts of mail fraud relating to the financial aid applications to the Indiana schools, 18 U.S.C. § 1341, and four counts of federal financial aid fraud relating

to Mary Baldwin College, 20 U.S.C. § 1907. The charges related to the Simons' tax returns for 2003-2006. One of the foreign bank account report counts was dismissed on the government's motion on the eve of trial. The jury acquitted Mr. Simon on three of the mail fraud counts — evidence that the financial aid documents in those counts had been mailed was thin — and convicted him on all other counts.

Mr. Simon objects to ¶¶ 8-16 of the presentence report, which comprise the government's version of the crimes. The court finds none of those objections to be persuasive. The statements in those paragraphs to which objection is made are supported by credible evidence presented at trial. The court overrules Mr. Simon's objections to ¶¶ 8-16 of the presentence report.

### A. The Tax Counts

### 1. Base Offense Level

### a. Duplicitness of Counts of Conviction

The guidelines direct that the counts of conviction be grouped for purposes of determining the offense level. U.S.S.G. § 3D1.2(d). Counts 1-4 are grouped and treated as a single offense for purposes of determining their offense level. U.S.S.G. § 3D1.2(d). The presentence report and the government contend that the tax loss for those counts consists of $3,167,506 in unreported income from 1999 to 2007 (the trial addressed only 2004-2007; the remaining years are included as relevant conduct, *see* U.S.S.G. § 1B1.3(a)(2)) multiplied by 28 percent, U.S.S.G. § 2T1.1(c),

or $886,901. A tax loss in that amount produces a base offense level of 20. U.S.S.G. § 2T4.1(H).

Mr. Simon objects to that calculation. He contends, for two reasons, that no tax loss can be assessed. First, Mr. Simon argues that the general verdict on counts 1-4 doesn't tell us whether the jury found his tax returns to be false because income was understated, or rather because (as was also charged) the returns didn't include disclosure of the foreign accounts. Failure to check the box that indicates foreign accounts, Mr. Simon argues, isn't a crime that causes a tax loss; since we can't say for certain that the jury found him guilty of any crime that caused a tax loss, we can't compute his offense level with reference to tax loss. So, he says, his offense level must be six.

Mr. Simon grounds this argument on United States v. Sturdivant, 244 F.3d 71 (2d Cir. 2001). Mr. Sturdivant sold 3.4 grams of crack cocaine to an informant in the afternoon of February 9, 1997. In the evening of the same day, Mr. Sturdivant sold another 2.8 grams of crack cocaine to the same informant, but Mr. Sturdivant had gotten the drug from another supplier. Mr. Sturdivant went to trial on one count of conspiracy to distribute more than five grams of crack cocaine and distribution of more than five grams of crack cocaine. At the conclusion of the government's case, the district judge found that the evidence was insufficient to establish the existence of the single conspiracy charged in the first count, and dismissed that count. The case proceeded on the second count, and the jury returned a general verdict of guilty. The district court applied the

9

mandatory minimum and guidelines triggered by more than five grams of crack cocaine, and sentenced Mr. Sturdivant to 63 months.

The court of appeals held that Mr. Sturdivant (who, like Mr. Simon in our case, hadn't objected to the count's duplicitness at or before trial) had waived a duplicitness argument because the duplicity wasn't apparent on the face of the indictment at the outset: given the conspiracy charge, the two same-day sales appeared to have been part of a single continuing scheme. 244 F.3d at 76. Further, the court held, plain error analysis would be available in any event. 244 F.3d at 77. Because the only count of conviction charged two crimes and the sentencing judge made no relevant conduct findings, the court of appeals held, a sentence based on both crimes alleged in the count couldn't stand. 244 F.3d at 77-79. The remedy, the court decided, was for Mr. Sturdivant to be re-sentenced on the basis of the less serious of the two possible crimes of conviction: the evening 2.8 gram sale. 244 F.3d at 80. Importantly, the court of appeals specifically said that the resentencing court could consider whether the 3.4 gram afternoon sale should be considered as relevant conduct. Id.

Sturdivant doesn't affect the calculation of Mr. Simon's sentencing range because counts 1-4 of Mr. Simon's indictment are not duplicitous. A charge is duplicitous when it alleges more than one crime, United States v. Starks, 472 F.3d 466, 470 (7th Cir. 2006), a situation often seen when the statute cited in the count defines more than one crime. *See, e.g.*, United States v. Savoires, 430 F.3d 376, 379-380 (6th Cir. 2005) (18 U.S.C. § 924(c) creates two separate crimes of

"use" and "possession"). " Duplicity creates a risk that the jury might return a less than unanimous guilty verdict, potentially exposes the defendant to prejudice at trial and sentencing, and in some cases subjects the defendant to double jeopardy." United States v. Pansier, 576 F.3d 726, 734 (7th Cir. 2009). But when the statute defines a single crime that can be committed in any of several ways, a count that charges that the defendant committed that single crime in more than one way, the "ways in which [the statutory crime] can be committed may be alleged in the conjunctive in one count . . . and proof of any of them will support [a] conviction." United States v. Haynes, 582 F.3d 686, 704 (7th Cir. 2009).

The crime charged in counts 1-4 of Mr. Simon's indictment alleges commission of the crime charged in 26 U.S.C. § 7206(1):

> Any person who--
>> (1) Declaration under penalties of perjury.--Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . .
> shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

That statute defines a single crime, committed by wilfully making and subscribing a sworn return not believed to be true in every manner. The making and subscribing the false return is the crime; the statute doesn't make each false entry in a single return a separate crime.

11

Counts 1-4 of Mr. Simon's indictment, then, were not duplicitous. They didn't raise the risk that Mr. Simon would, like Elbert Sturdivant, be convicted by a jury consisting of some jurors thinking him guilty of one crime and some jurors thinking him guilty of another. Mr. Simon's jury found, beyond a reasonable doubt, that Mr. Simon wilfully made a subscribed a sworn return he didn't believe to be true for the calendar year 2003, did so again in 2004, and again in 2005, and again in 2006. There is no uncertainty as to the crimes of which Mr. Simon was convicted in counts 1-4, so there is no need to ignore any provision of the sentencing guidelines (or, eventually, any other sentencing consideration under 18 U.S.C. § 3553) triggered by convictions for violation of 26 U.S.C. § 7206(1).

### b. Sufficiency of Evidence of Tax Loss

Mr. Simon also objects to the presentence report's tax loss calculation on the grounds set forth in testimony by Herbert Long, an accountant and former Internal Revenue Service agent, hearing officer, and associate chief of the appeals office. Mr. Long has offered, either through testimony or proffer, various opinions in these proceedings that various payments to the Simons were reimbursements of expenses, loan receipts, loan repayments, or distribution of capital. He has evaluated the tax loss at anywhere from zero to $173,000.

Mr. Long was a very likeable witness, but in the end was not a persuasive one. When asked what caused him to change or expand his opinions at various points during these proceedings, he seemed to say that he proposed any plausible

scenario that would favor his client. He supported his opinions by assuming the truth of what Mr. Simon said or wrote, and by inferring that since Mr. Simon loaned to others, others loaned to him.

The trial evidence is far more persuasive to the court than Mr. Long's suppositions. The moneys that the Simons funneled to themselves were taken without authorization and used as income would have been used. No one viewed them as reimbursements or as distributions of capital.

Nor, despite the accounting entries the Simons made, did anyone truly view them as loans. There was scant evidence (and no credible evidence) that anyone associated with the entities from which the money came knew that they were "loaning" Mr. Simon anything; it does not appear that Mr. Simon negotiated or bargained with anyone to get the money; no note or other instrument memorializes any loan to Mr. Simon after 1997, much less any terms for time or method of repayment or interest due. The lack of documentation is particularly noteworthy with respect to JAS Partners, which claimed to have been in the business of lending, but actually seems to have done little but serve as a pipeline into the Simons' personal accounts.

The court finds, by a preponderance of the evidence, that Mr. Simon received from the entities at issue, and did not report or pay taxes on, the following sums in the following years (these figures include years as to which no charges were filed, pursuant to U.S.S.G. § 1B1.3(a)(2):

| | |
|---|---|
| 1999 | $177,400 |
| 2000 | $380,781 |
| 2001 | $258,228 |
| 2002 | $158,402 |
| 2003 | $245,800 |
| 2004 | $341,143 |
| 2005 | $472,637 |
| 2006 | $739,920 |
| 2007 | 393,195 |
| | $3,167,506 |

Because the crimes involved filing tax returns that under-reported gross income, the tax loss is defined at 28 percent of the unreported gross income, unless a more accurate determination of the loss can be made. U.S.S.G. § 2T1.1(c)(1)(A). No more accurate determination can be made on this record — other calculations are possible, but none are more accurate.

The court overrules Mr. Simon's objections to ¶¶ 11, 13, 16, 20-22, and 65 of the presentence report. The tax loss is 28 percent of $3,167,506, or $886,901.69. The offense level is 20. U.S.S.G. § 2T4.1(H).

### 2. Tax Counts Enhancements

#### a. Sophisticated Means

U.S.S.G. § 2T1.1(b) requires a two-level offense enhancement if "the offense involved sophisticated means...." The presentence report and the government

contend this enhancement applies. Mr. Simon objects, arguing that the entities primarily involved in the transactions (JS Elekta and Elekta Limited) used domestic bank accounts and that in any event, the use of offshore accounts is unremarkable for one with twenty years of experience as an international businessman.

Mr. Simon insists on greater sophistication than the guidelines require for this enhancement. Application Note 4 tells us that

> For purposes of subsection (b)(2), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

This definition, while more demanding than the earlier standard of "'a greater level of planning or concealment' than a typical fraud of that kind," <u>United States v. Wayland</u>, 549 F.3d 526, 528 (7th Cir. 2008) (*citing* <u>United States v. Robinson</u>, 538 F.3d 605, 607-608 (7th Cir. 2008), doesn't require sophistication so great that nothing more intricate can be imagined.

Mr. Simon used multiple entities to hide and disguise income. There were no apparent legitimate reasons for so many business entities. JAS Partners seems to have existed solely as a chute for money into the Simons' personal accounts. He used accounts in foreign countries one wouldn't associate with either the entity or his business. Funds were broken into other checks, often routed through two or three entities to Mrs. Simon, all in a single day, as on July 15, 2004 and July

26, 2005. Those complexities and intricacies allowed Mr. Simon to walk off with tax-fee compensation for about eight years, *see* <u>United States v. Wayland</u>, 549 F.3d at 529 ("his overall scheme, which lasted nine years and involved a series of coordinated fraudulent transactions, was complex and sophisticated"), bamboozled worldly and urbane investors in Ichua, and involved especially complex and especially intricate offense conduct pertaining to the execution or concealment of the scheme. The court overrules Mr. Simon's objection to ¶¶ 23 and 66 of the presentence report. His offense level on counts 1-4 is increased by two levels, to level 22.

### b. Role in the Offense

The guidelines require a two-level enhancement for a defendant who was an organizer, leader, manager, or supervisor of another criminal participant. U.S.S.G. § 3B1.1(c). The government and the presentence report contend this enhancement is required because Mr. Simon led his wife Denise in the process that led to the false income tax returns. Mr. Simon objects, arguing that the record establishes neither that he led or supervised his wife nor that she was a criminal participant. He also challenges the enhancement's applicability when the participants are spouses.

The law doesn't support Mr. Simon's proposition that the role in offense enhancement doesn't apply when one spouse directs another. In <u>United States v. Herrera</u>, 878 F.2d 997 (7th Cir. 1989), the defendant directed his wife's

participation in drug distribution. The court of appeals rejected the argument Mr. Simon makes today: "It is also irrelevant that the criminal participants happen to be husband and wife. The guidelines contain no spousal exception; rather, 3B1.1(c) applies any time there is more than one participant, regardless if the participants happen to be husband and wife." <u>Id</u>. at 1002 (citation omitted).

Denise Simon was a participant in the tax fraud scheme. She received most of the money, often via several checks in the same day. She was the primary record-keeper who entered the money as "loans." She was an account signatory for JAS Partners, Elekta Limited, and J.S. Elekta Ltd. She signed the false tax returns and apparently filed some of them by mailing them. Mrs. Simon served as bookkeeper for several of the related entities, kept minutes for them, and participated in several of their board meetings and some of their correspondence.

Denise Simon was a knowing participant, and so a criminal participant, in the tax fraud scheme. Many (perhaps most) of the money arrived at the Simons' doorstep by way of checks payable to Mrs. Simon. She had to have known when she entered those checks as "loans" in the records she maintained that she hadn't borrowed money from the payor entity. Her knowledge is demonstrated by her false statement to I.R.S. Special Agent Paul Muschell, on the morning that the search warrant was executed at the Simon residence, that no financial records were in the residence and that all the records were with James Simon in Ukraine; in truth, the records were on a computer at the residence, under Mrs. Simon's screen name.

Finally, Mr. Simon directed Denise Simon in the execution of the tax fraud scheme, as demonstrated by the e-mails admitted into evidence at the sentencing hearing as Government Exhibits 4 through 8, in which James Simon instructed Denise Simon as to what to do with various financial instruments.

Mr. Simon managed Denise Simon in this criminal activity. The court overrules Mr. Simon's objections to ¶¶ 15, 24, and 68 of the presentence report. His offense level on counts 1-4 is increased by two levels, to level 24, because of his role in the offense.

### c. Abuse of Position of Trust

U.S.S.G. § 3B1.3 requires a two-level offense enhancement for a defendant who abused a position of trust in a way that significantly facilitated the commission or concealment of the offense. The government and the presentence report contend that Mr. Simon did both: that his use of the entities' money abused the trust of the entities themselves and the entities' other owners, who placed Mr. Simon in a lightly supervised position of extraordinary discretion; and that Mr. Simon's training and experience as an accountant and financial expert facilitated his weaving a web of accounts, some in unexpected offshore locations, through which he could pass money to himself. Mr. Simon objects on several grounds. He denies that he held positions of trust in the entities, and denies that he used his skills and knowledge in any sophisticated way the facilitated the crimes or their concealment.

Mr. Simon's argument is difficult to understand. Mr. Simon was managing director of Ichua Limited and JS Elekta Leasing Ltd. He was president of William R. Simon Farms, Inc. and Elekta Ltd. He was general partner of JAS Partners. Beyond the repose of trust inherent in naming a person to such positions (much less to all the positions) with broad inherent discretion, Mr. Simon had significantly less supervision than would employees whose responsibilities are generally less discretionary. He (and in some instances his wife) had signature authority on the business accounts, and he had (as evidence by the way things played out) authority to issue checks without board or majority partner approval. The sentencing hearing testimony of Roland Bopp demonstrates that while Ichua and JS Elekta Leasing had conscientious and capable board members, Mr. Simon had sufficiently thinly supervised discretion to pilfer hundreds of thousands of dollars that investors (including some of the directors) had intended for construction of a telecommunication system in Ukraine.

That lightly supervised discretion in the operation of these companies and partnerships made it possible for Mr. Simon to divert millions of the entities' dollars to his personal use. He abused a position — indeed, five positions — of private trust. The court overrules Mr. Simon's objections to ¶¶ 25 and 69 of the presentence report. His offense level on counts 1-4 is increased by two levels, to level 26, because of his abuse of his positions of trust.

The pre-grouping offense level for counts 1-4 is 26.

*B. The FBAR Counts*

*1. Base Offense Level*

Counts 6-8, the foreign bank account report ("FBAR") counts, are grouped as a single offense, as well. U.S.S.G. § 3D1,2(d). The base offense level for violation of 31 U.S.C. § 5314 is "6 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds . . .." U.S.S.G. § 2S1.3(a)(2). The total value of the foreign bank accounts (according to the return Mr. Simon belatedly filed in 2010) from 2003 to 2007 was $50,064,000. The referenced table assigns 24 levels to a value of more than $50 million. U.S.S.G. § 2B1.1(b)(1)(M). The offense level for Mr. Simon's FBAR counts, then, starts at 30.

The presentence report recommends that calculation of the pre-grouping offense level for counts 6-8 end there. The parties disagree, though for different reasons.

Mr. Simon argues for application of U.S.S.G. § 2S1.3(b)(3), which requires that the offense level be reduced to six if (a) the defendant didn't know or believe that the funds were proceeds or, or were intended to promote, unlawful activity, and the crime didn't involve bulk cash smuggling, (b) the offense wasn't committed as part of a pattern of unlawful activity involving more than $100,000 in a twelve-month period, (c) the defendant didn't act with reckless disregard of the source of the funds, (d) the funds were the proceeds of lawful activity, and (e) the funds were to be used for a lawful purpose. Mr. Simon bears the burden of demonstrating the

applicability of this "safe harbor" provision by a preponderance of the evidence. United States v. Keleta, 552 F.3d 861, 866 (D.C. Cir. 2009).

Mr. Simon has met this burden. He has shown that the money that went into the related entities were proceeds of lawful activity — raising funds to develop and construct a telecommunications company in Ukraine. Mr. Simon hasn't accounted for each dollar that went into the related entities, but the guideline doesn't require him to do so; guideline issues must be proven by a preponderance of the evidence. *See, e.g.,* United States v. Saenz, 623 F.3d 461, 467 (7th Cir. 2010) (defendant must prove entitlement to reduction by preponderance). He has explained why people put money into those entities, and the record contains no suggestion that any of these accounts were used to launder proceeds from sales of weaponry, drugs, classified secrets, gambling, prostitution, or other racketeering activities. Unlike the district courts in United States v. Sweeney, 611 F.3d 459, 477 (8th Cir. 2010) and United States v. Keleta, 552 F.3d 861 (D.C. Cir. 2009), this court has enough information to find that it is more likely than not that the funds in the entities' accounts were the proceeds of lawful activity.

The funds were to be used for lawful purposes — again, to develop and construct a telecommunications company in Ukraine. Even after Mr. Simon diverted them from that purpose, they were used for lawful purposes — the support, education, and entertainment of the Simon family. It might be true, as the government suggests, that Mr. Simon committed wire fraud to divert those

funds, but that crime simply shifted the money from one lawful purpose to another.

The safe harbor provision in U.S.S.G. § 2S1.3(b)(3) applies. The court sustains Mr. Simon's objections to the presentence report's recommendation against application of the safe harbor provision, and reduces Mr. Simon's offense level for counts 6-8 to six.


*2. FBAR Count Enhancements*

The government argues that the enhancements for sophisticated means, aggravating role, and abuse of position of trust or use of a special skill apply to the FBAR counts (indeed, to all the counts), not just to the tax counts.

The government doesn't identify a guideline under which an offense level calculated under U.S.S.G. § 2S1.3(b)(3) might be enhanced for the use of sophisticated means. In any event, whatever the sophistication and complexity of the overall scheme, there is nothing complex about failing to file reports with a federal income tax return. Mr. Simon strove mightily and stealthily to extract tax-free dollars from the entities with which he was associated, but that's not what he was charged with having done in counts 6-8. In those counts, as Mr. Simon's was told, jury the criminal activity consisted of (1) Mr. Simon having signature or other authority over bank, securities, or other financial accounts in a foreign country in the year addressed in the count, (2) that had a balance exceeding $10,000 in aggregate value; (3) that Mr. Simon knew that he had a legal duty to file a report

of foreign financial accounts; and (4) that Mr. Simon knowingly and willfully failed to file the report on or before June 30 of the year addressed in the count. There is no sophistication involved in not filing those reports.

On the same reasoning, Mr. Simon's positions of private trust and his special skills as an accountant had much to do with Mr. Simon being in a position in which he was supposed to file these reports, but had no facilitating role in his failure to do so. No enhancement under U.S.S.G. § 3B1.3 is appropriate with respect to counts 6-8.

Denise Simon signed the tax returns and filed at least one by mailing it. She knew of the foreign accounts and had signature authority with respect to several of the accounts. She was a knowing participant, managed by Mr. Simon, in the scheme that led her to that circumstance. The court agrees with the government that Mr. Simon's offense level must be increased by two levels under U.S.S.G. § 3B1.1(c) with respect to the FBAR counts. The court sustains the government's objection to ¶ 62 of the presentence report and increases Mr. Simon's offense level by two levels, to level eight, on counts 6-8.

The court overrules the government's objections to ¶¶ 60 and 64 of the presentence report. The pre-grouping offense level for counts 6-8 is eight.

### C. The Mail Fraud and Education Fraud Counts

#### 1. Base Offense Level

Mail fraud is punishable by imprisonment for as long as twenty years, so the base offense level for counts 9-12, 15, and 17-23 is seven. U.S.S.G. § 2B1.1(a)(1). The court is to enhance that offense level according to a loss table if the loss exceeded $5,000. Mr. (and Mrs.) Simon attached false returns to private and federal financial aid applications that produced a total of $166,670.35 in financial aid for their children. The loss table requires a ten-level enhancement in offense level if the loss amount is more than $120,000 but not more than $200,000. U.S.S.G. § 2B1.1(b)(F). The government and the presentence report recommend that the court apply that ten-level enhancement.

Mr. Simon objects to the ten-level enhancement because, he contends, there was no tax loss. His argument stands on two legs. First, the court denied the government's forfeiture motion with respect to the mail fraud counts because the government had presented too little evidence "that the Simons wouldn't have received any need-based financial aid from Culver or Canterbury had they reported their income honestly." December 21, 2010 Opinion and Order (Doc. No. 138 at p. 4). And second, the Indiana schools have disclaimed any desire for restitution.

Mr. Simon's argument misapprehends what the court is to measure. "Loss," for purposes of U.S.S.G. § 2B1.1(b), is the greater of actual loss and intended loss. Application Note 3(A). Intended loss is the pecuniary harm that was intended to

result from the offense. Application Note 3(A)(ii). The government was unable to prove, for forfeiture purposes, actual loss from the mail fraud with respect to the Indiana schools, and appears to fall short as well with respect to proof of actual loss that is needed for an order of restitution.

None of those concerns address intended loss. It is inescapable to the court that the Simons attached their false federal income tax returns, with numbers bolstered by their omission of large sums spent on family travel (into which the applications inquired) because they intended to get financial aid that they wouldn't have received otherwise. But for their sham pretenses of need, the financial aid awards they sought might have gone to other applicants or not been awarded at all. What the Simons received from the financial institutions as a result of their fraudulent applications is within what the guidelines mean by "intended loss."

The loss — here, the intended loss — from these fraudulent applications for financial aid was more than $120,000 but not more than $200,000, requiring a ten-level enhancement in offense level. U.S.S.G. § 2B1.1(b)(F). The court overrules Mr. Simon's objections to ¶¶ 14, 16, 35, and 73 of the presentence report. Mr. Simon's offense level for 9-12, 15, and 17-23 is increased by ten levels, to level 17, because of the amount of the loss.

*2. Mail Fraud and Education Fraud Counts Enhancements*

The guidelines require a two-level enhancement if the fraud crime involved sophisticated means. U.S.S.G. § 2B1.1(b)(9)(C). "Sophisticated means" has the same meaning for the fraud guidelines that it had with respect to the tax fraud calculation. U.S.S.G. § 2B1.1 Application Note 8(B). The presentence report and Mr. Simon recommend against applying this enhancement; the government objects. Once the tax forms were created and filed (completing the crime of filing a false tax return), there was nothing especially complex or intricate about using the forms as attachments to financial aid forms. The court agrees with the presentence report and Mr. Simon that the fraud crimes didn't involve sophisticated means within the meaning of U.S.S.G. § 2B1.1(b)(9)(C). The court overrules the government's objection to ¶ 73 of the presentence report. Mr. Simon's offense level for counts 9-12, 15, and 17-23 remains at 17.

The government contends that the two-level role in the offense enhancement applies with respect to counts 9-12, 15, and 17-23 because Mr. Simon directed Denise Simon in the commission of the financial aid fraud. The court agrees with the government. Evidence at trial indicated that Mrs. Simon delivered papers to the schools in conjunction with the financial aid applications, pursuant to James Simon's direction. The court sustains the government's objection to ¶ 75 of the presentence report. Mr. Simon's offense level with respect to counts 9-12, 15, and 17-23 is increased by two levels, to level 19, because of his managerial role in the fraud.

The government contends that Mr. Simon's offense level on the fraud counts should be increased by another two levels pursuant to U.S.S.G. § 3B1.3, the "abuse of position of trust or use of a special skill" enhancement applied in calculating the offense level for the tax counts. Mr. Simon and the presentence report disagree, as does the court. Enhancement of Mr. Simon's offense level for his role in the offense forecloses any further enhancement for use of a special skill, U.S.S.G. § 3B1.3 ("if this adjustment is based solely on the use of special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role)"), and Mr. Simon held no position of private trust with respect to Culver Academies, Canterbury School, or Mary Baldwin College. The court overrules the government's objection to ¶ 77 of the presentence report.

The pre-grouping final adjusted offense level for counts 9-12, 15, and 17-23 is 19.

## D. Grouping the Offense Levels

Mr. Simon's offense level for counts 1-4 is 26; his offense level for counts 6-8 is 8; his offense level for counts 9-12, 15, and 17-23 is 19. The group with the highest offense level — counts 1-4, at level 26 — is counted as one unit. U.S.S.G. § 3D1.4(a). The group that is seven levels less serious than the most serious — counts 9-12, 15, and 17-23, at level 19 — is counted as one-half a unit. U.S.S.G. § 3D1.4(b). The group that is 18 levels less serious than the most serious group

— counts 6-8, at level 8 — is disregarded for purposes of calculating the post-grouping offense level. U.S.S.G. § 3D1.4(c).

Because there are one and one-half units in Mr. Simon's guideline calculation, the offense level of the most serious group is increased by one level. The post-grouping offense level is 27.

*E. Acceptance of Responsibility*

The sentencing guidelines require a two-level offense level reduction for a defendant who clearly accepted responsibility for the offenses of conviction. U.S.S.G. § 3E1.1(a). Mr. Simon's decision to go to trial steepens his climb to this reduction, but doesn't make it impossible; "[i]n rare situations a defendant may clearly demonstate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt ...." Application Note 2 to U.S.S.G. § 3E1.1. Mr. Simon contends that he didn't deny the conduct alleged in the tax counts — the transactions themselves — but rather challenged the funds' proper legal characterization. With respect to the FBAR counts, he says he was trying to preserve his claim that an IRS notice meant that he didn't have to file FBARs during the years charged. Mr Simon says that the financial aid was awarded without reliance on the tax returns or expenditure information he submitted with the applications.

Mr. Simon hasn't accepted responsibility within the meaning of the sentencing guidelines. Through the sentencing hearing, he has denied that the money that cascaded into his personal accounts was income. He moved for judgment of acquittal on all counts at the close of the government's case in chief, at the close of all the evidence, and post-trial, based on the insufficiency of the evidence. Mr. Simon has expressed no remorse whatsoever.

Mr. Simon denied essential factual elements at trial and put the government to its burden of proof. He had every right to do so. But he hasn't accepted responsibility within the meaning of the guidelines, and is not entitled to a reduction in offense level for having done so. The court overrules Mr. Simon's objections to ¶ 76 of the presentence report. His final post-grouping adjusted offense level is 27.

### III.  Summary of Rulings on Objections

Although the objections don't affect the advisory guideline range, the government has objected to the presentence report to the extent it opines that Mr. Simon doesn't have the money to pay a fine. Noting Mr. Simon's substantial income in 2009, what would appear to be extraordinary expenditures by Mr. Simon during this prosecution, and that JAS Partners had assets of just under $4 million as of the end of 2008. The presentence report responds that Mr. Simon reported having liquidated most of JAS Partners for his defense. The government voices a very reasonable suspicion, given Mr. Simon's handling of these accounts

in the past, but a party objecting to a presentence report's factual content bears a higher burden. The objector must furnish some evidence that calls into question the reliability or correctness of the presentence report. <u>United States v. Mays</u>, 593 F.3d 603, 608 (7th Cir. 2010). The party that agrees with the presentence report has the burden of demonstrating the report's accuracy only when the objector creates real doubt as to the information's reliability. <u>United States v. Maiden</u>, 606 F.3d 337, 339 (7th Cir. 2010); <u>United States v. Panice</u>, 598 F.3d 426, 439 (7th Cir. 2010). The government has not raised real doubt about Mr. Simon's present ability to pay a fine in addition to restitution that will, according to the presentence report, exceed $1 million. The court overrules the government's objection to ¶¶ 127 and 128 of the presentence report.

In summary, the court sustains Mr. Simon's objections to the presentence report's recommendation against application of the safe harbor provision in U.S.S.G. § 2S1.3(b)(3), and sustains the government's objections to ¶¶ 62 and 75 of the presentence report. Those rulings require the court to reject the grouping paragraphs (¶¶ 78-84) of the presentence report, as well. The court adopts as its own findings ¶¶ 1-61, 63-74, 76-77, and 85-144 of the presentence report, specifically including ¶¶ 90-127 concerning Mr. Simon's financial condition and earning ability.

*IV.  Calculation of Advisory Range*

This is Mr. Simon's first criminal conviction of any sort, so he is assigned to criminal history category I. Given the offense level of 27, the sentencing guidelines recommend a sentencing range of 70 to 87 months' imprisonment. A hearing to determine a reasonable sentence will be scheduled in a separate order after consultation with counsel's schedules.

ENTERED:   March 14, 2011


   /s/ Robert L. Miller, Jr.
Judge
United States District Court


cc:  A. LaSpada, C. Piasecki, F. Gray
     J. Barrett
     USPO