UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NO.:3:14-CV-2025-RLM |
| | ) | (ARISING FROM 3:10-CR-0056-RLM) |
| JAMES A. SIMON | ) | |

OPINION AND ORDER

In November 2010, a jury found James A. Simon guilty of filing false tax returns, failing to report his interest in foreign bank accounts, mail fraud, and federal financial aid fraud. The court sentenced Mr. Simon to a total of 72 months imprisonment to be followed by three years of supervised release, and the court of appeals affirmed the conviction and sentence. Mr. Simon now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. For the reasons that follow, the court denies Mr. Simon's motion.

I. BACKGROUND

The factual background underlying Mr. Simon's conviction is set out in detail in the court of appeals' opinion denying Mr. Simon's direct appeal. United States v. Simon, 727 F.3d 682 (7th Cir. 2013). Because Mr. Simon's "business dealings require a flowchart to unravel," id. at 683, the court recites only the

facts needed to resolve the specific arguments Mr. Simon raises in his § 2255 motion.

Mr. Simon was a certified accountant, professor of accounting, and entrepreneur with interests in several businesses and entities. One of those ventures was JAS Partners, a domestic limited partnership in which Mr. Simon and his wife each had a one percent partnership stake and the Cook Islands-based Simon Family Trust owned the other 98 percent. Another of Mr. Simon's ventures was Elekta Ltd., a corporation chiefly owned by Mr. Simon's retired sisters but entrusted wholly to Mr. Simon's management. Elekta owned nineteen percent of a third venture that Mr. Simon managed, JS Elekta. JS Elekta in turn owned 75 percent of a fourth business, Ichua Company, also managed by Mr. Simon. Of those four businesses over which Mr. Simon had signature authority, three – Elekta, JS Elekta, and Ichua – were foreign entities possessing foreign bank accounts.

This case is about money that Mr. Simon paid to himself from those four entities and from another domestic venture, William R. Simon Farms. Between 2003 and 2006, Mr. Simon (or his immediate family members) received about $1.8 million combined from the businesses, which Mr. Simon spent on personal and family expenses and recorded as loans in his personal financial records. No promissory notes existed for these purported loans, and Mr. Simon paid no interest to the companies that made them. He repaid a small portion of the principal to JAS Partners after becoming aware of the government's investigation

into his finances. He reported none of this money as income on his tax returns. In 2005 Mr. Simon paid less than $400 in taxes, and in each of the other three years between 2003 and 2006 he paid no taxes at all and claimed a refund. None of the tax returns disclosed that Mr. Simon had interests in or control over foreign bank accounts. Mr. Simon prepared and filed these tax returns himself.

During these years, Mr. Simon filled out need-based financial aid applications for the private schools his children attended. On these applications, he reported that he had no or very little income, suffered large debts or losses, spent no money on clubs or vacations, had only a few thousand dollars of assets, was in a precarious financial situation due to business failures and litigation, and had enough money to keep him "afloat but barely." These representations were all false: Mr. Simon had the payments from his businesses, spent lavishly on several expensive club memberships, and could afford vacations to Europe and Disney World in addition to a comfortable lifestyle for himself and his family. Based solely on these applications and the tax forms Mr. Simon submitted, the schools gave the Simon family a total of $120,000 in need-based financial aid. Mr. Simon also filled out federal "FAFSA" financial aid applications for one of his daughters to attend college. As he did on his private financial aid applications, Mr. Simon reported minimal gross income and assets on the FAFSA application.

In November 2007, IRS agents searched Mr. Simon's house pursuant to a warrant. Mr. Simon hired attorneys soon after that and began preparing a defense to possible charges. His attorneys hired a team of investigators and

conducted their own investigation into Mr. Simon's finances, including interviewing the people already interviewed by government agents. Mr. Simon's defense team also met with prosecutors to discuss the probable charges, to guide their planning of colorable defenses.

In April 2010, Mr. Simon was charged in a 23-count indictment. Counts 1-4 alleged that Mr. Simon filed false tax returns for the years 2003-2006. The tax returns were allegedly false in that they underreported income, and in that they didn't check the "yes" box of Line 7a on Schedule B to IRS Form 1040. The question associated with Line 7a asked whether Mr. Simon had any interest in or authority over foreign accounts. Counts 5-8 charged Mr. Simon with failing to file forms called Reports of Foreign Bank and Financial Account, or "FBARs," for the years 2004-2007. FBARs concern foreign financial accounts, and a person is required to file them if he or she has an interest in or signature authority over foreign accounts worth more than $10,000. Counts 9-19 charged Mr. Simon with mail fraud related to the need-based financial aid applications he made to the private schools his children attended. Those counts alleged that Mr. Simon underreported his income on the forms, and that the tax returns he attached were fraudulent for the same reasons as alleged in counts 1-4. Counts 20-23 charged Mr. Simon with federal financial aid fraud based on the FAFSA forms he filled out on his daughter's behalf. The FAFSA application required Mr. Simon to include information from his tax returns; if the tax returns were false (as alleged in counts 1-4), the aid applications were fraudulent as well.

At trial, Mr. Simon's defense to the tax fraud counts was generally that the $1.8 million he received from his business entities wasn't taxable income. He primarily characterized the money as funds loaned to him legitimately by his businesses, and which he intended to pay back. He suggested in the alternative that the payments could be considered nontaxable partnership distributions rather than taxable income. With regard to not checking the "yes" box on the part of Schedule B of his tax returns asking whether he had interest in or control over any foreign bank accounts, Mr. Simon's defense was that he used TurboTax software to automatically fill out his tax forms. Based on how he answered the program's questions, the program didn't ask him anything about foreign accounts. His defense as to the FBAR reporting requirements was that the requirements were confusing, and in any case filing or not filing them had no effect on tax liability so there would be no reason for him to intentionally conceal his control over the foreign accounts. With regard to the mail fraud and financial aid fraud counts, Mr. Simon's defense was that if the jury accepted his explanations on the tax and FBAR issues – that the money wasn't taxable income and he didn't think he had to file the FBARS – then none of the statements on the financial aid applications were false. In addition, for the private financial aid applications, even if his statements about his income and assets were false they weren't materially so; because his children were high-performing academically, the schools wanted them to attend and essentially made price concessions on tuition. He argued that the schools themselves had instructed him to just

estimate the information on the forms, because the answers wouldn't really affect the amount of tuition his family would have to pay.

After a six-day trial, the jury mostly rejected these explanations. The jury found Mr. Simon not guilty of three of the mail fraud counts but guilty as to the other twenty counts in the indictment. The court sentenced Mr. Simon to an aggregate term of 72 months imprisonment and an aggregate term of 3 years of supervised release.[1] The court of appeals affirmed the conviction in all respects, and Mr. Simon timely filed this motion to vacate under § 2255.

A federal prisoner can challenge his sentence on the ground that the sentence was "imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Mr. Simon is entitled to relief under § 2255 only if he can show a "fundamental defect which inherently results in a complete miscarriage of justice," United States v. Addonizio, 442 U.S. 178, 185 (1979), or "an omission inconsistent with the rudimentary demands of fair procedure," Hill v. United States, 368 U.S. 424, 428 (1962).

Issues not argued and decided on direct appeal can't ordinarily be raised in a § 2255 petition unless the petitioner can show good cause and actual

---

[1] Mr. Simon notified the court that he anticipated being released to home confinement on June 1, 2016 and so may no longer be in custody. Nonetheless, he has notified the court that he intends to pursue relief under § 2255 despite his release, and he is entitled to do so because he was in custody when he filed his petition. *See* Virsnieks v. Smith, 521 F.3d 707, 717-718 (7th Cir. 2008).

prejudice for the procedural default. <u>Galbraith v. United States</u>, 313 F.3d 1001, 1006 (7th Cir. 2002). Claims of ineffective assistance of counsel are an exception, and can still be argued in a § 2255 petition even if not raised on direct appeal. *See* <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003) (holding that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.").

The court in which a § 2255 motion is brought must hold an evidentiary hearing if affidavits or other competent proof establishes a dispute as to a material factual issue. *See* <u>Taylor v. United States</u>, 287 F.3d 658, 660 (7th Cir. 2002). An evidentiary hearing isn't required if "the motion and files and records of the case conclusively show that the petitioner is entitled to no relief," 28 U.S.C. § 2255 (2012), or if the petitioner's factual allegations are purely speculative. *See* <u>Gallo-Vasquez v. United States</u>, 402 F.3d 793, 797 (7th Cir. 2005) ("[A] hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific factual allegations.") (alteration in original) (internal quotation marks omitted).

Based on Mr. Simon's § 2255 motion and the record of this case, the court concludes that the factual and legal issues raised can be resolved on the record and no hearing is necessary. *See* <u>Menzer v. United States</u>, 200 F.3d 1000, 1006 (7th Cir. 2000) (holding that a hearing is not required where the record conclusively demonstrates that a petitioner is entitled to no relief on his § 2255

motion). Even accepting all relevant facts as Mr. Simon alleges them, he hasn't shown that he is entitled to relief.

## II. DISCUSSION

Mr. Simon brings two general claims, both grounded in the allegation that his trial counsel provided constitutionally ineffective assistance. The Sixth Amendment guarantees criminal defendants the right to constitutionally sufficient representation by an attorney. This right provides for only "a professionally competent defense, not for the best possible defense." <u>Rutledge v. United States</u>, 230 F.3d 1041, 1053 (7th Cir. 2000) (quoting <u>Holman v. Gilmore</u>, 126 F.3d 876, 883 (7th Cir. 1997)). To prevail on an ineffective assistance of counsel claim, Mr. Simon must show both that his attorneys' performance "fell below an objective standard of reasonableness" and that there is a reasonable probability that, but for his attorneys' errors, the result of the proceeding would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 688-693 (1984). This is a difficult standard to meet; to prevail, Mr. Simon must show both "that counsel made errors so serious that 'counsel' was not functioning as the counsel guaranteed the defendant by the Sixth Amendment" and "that counsel's errors were so serious as to deprive [Mr. Simon] of a fair trial, a trial whose result is reliable." <u>Strickland v. Washington</u>, 466 U.S. at 687; *see also* <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance

between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").

With regard to the performance prong of the Strickland inquiry, there is a strong presumption that counsel performed effectively. *See* Berkey v. United States, 318 F.3d 768, 772 (7th Cir. 2003). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Vinyard v. United States, 804 F.3d at 1225 (quoting Strickland v. Washington, 466 U.S. at 687). The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances" known to counsel at the time. Kimmelman v. Morrison, 477 U.S. at 381. An attorney's performance is judged holistically, and even a clear mistake doesn't amount to constitutionally ineffective assistance where the attorney's performance was competent on the whole. *See* Dahler v. United States, 143 F.3d 1084, 1086 (7th Cir. 1998) (noting that "it is essential to examine the attorney's entire work product; an isolated slip-up in an otherwise competent representation does not violate the sixth amendment"). Because reviewing courts shouldn't second-guess counsel's strategic choices, the burden of showing that counsel's decisions fell outside the wide range of reasonable strategic choices "rest[s] squarely on the defendant." Burt v. Titlow, 134 S. Ct. 10, 12, 187 L. Ed. 2d 348 (2013). "The question is whether an attorney's representation amounted

to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Makiel v. Butler</u>, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted).

"Even if counsel's performance was deficient, a petitioner must also show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' meaning 'a probability sufficient to undermine confidence in the outcome.'" <u>Eckstein v. Kingston</u>, 460 F.3d 844, 848 (7th Cir. 2006) (quoting <u>Strickland</u>, 466 U.S. at 694). While a petitioner must do more than just show that counsel's errors had some conceivable effect on the outcome, he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." <u>Strickland</u>, 466 U.S. at 693. "In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." <u>Eckstein v. Kingston</u>, 460 F.3d at 848 (quoting <u>Hough v. Anderson</u>, 272 F.3d 878, 891 (7th Cir. 2001)).

Both the performance and prejudice prongs of the <u>Strickland</u> inquiry must be satisfied before a prisoner is entitled to relief, and if a claim fails under either prong the claim fails and the court need not address the remaining prong. *See* <u>United States v. Taylor</u>, 569 F.3d 742, 748 (7th Cir. 2009) ("Courts may deny ineffective assistance of counsel claims for lack of prejudice without ever

considering the question of counsel's actual performance."); <u>Milone v. Camp</u>, 22 F.3d 693, 703 (7th Cir. 1994) ("The Court need not address both <u>Strickland</u> prongs if it is clear that [the petitioner] cannot satisfy one of them").

As an initial matter, both Mr. Simon and the government focus heavily on matters that aren't actually material to resolving the claims in the § 2255 motion. The government points extensively to outward indicia of diligence on the part of Mr. Simon's lawyers – the number of attorneys Mr. Simon had, the quantity of investigators and experts they hired, the sheer volume of pretrial, mid-trial and post-trial motions, and the extensive presentation of evidence at trial and sentencing. The government is correct that the constitutional effectiveness of trial counsel should be examined holistically. "Isolated errors do not constitute ineffective assistance if the attorney's work product taken as a whole demonstrates competence." <u>Rutledge v. United States</u>, 230 F.3d 1041, 1053 (7th Cir. 2000).

But sheer activity doesn't equate to constitutional effectiveness. A large, expensive defense team filing a flurry of motions might still be ineffective if their decision making on a critical point falls below an objective standard of reasonableness, just as a single attorney doing nothing other than negotiating a quick plea can be constitutionally effective. *See* <u>Premo v. Moore</u>, 562 U.S. 115, 123-125 (2011). Pointing to all the dust Mr. Simon's attorneys kicked up before and during trial doesn't resolve the question of whether some specific acts or

omissions fell below a professional standard of reasonableness such that Mr. Simon was denied the effective assistance of counsel.

At the same time, Mr. Simon makes voluminous factual allegations and arguments about the defense team's pre-trial game plan and whether his attorneys followed it. Mr. Simon insists that his pretrial agreement with his attorneys as to what defense they would pursue is relevant because it shows his counsel knew the agreed-on defense to be the best available one. Even if Mr. Simon is correct that he and counsel agreed on a strategy before trial and that the strategy eventually pursued at trial deviated from that plan, that doesn't show ineffectiveness. For one thing, whether his attorneys provided the "best" available defense isn't the issue in a § 2255 motion, because "[t]he Constitution calls for a professionally competent defense, not for the best possible defense." Rutledge v. United States, 230 F.3d 1041, 1053 (7th Cir. 2000). For another thing, which strategy appears optimal might shift over time. "Trial tactics are a matter of professional judgment" and a reviewing court "will not play 'Monday morning quarterback' when reviewing claims that an attorney rendered constitutionally deficient representation in making decisions on how to best handle a case." United States v. Malone, 484 F.3d 916, 920 & n. 1 (7th Cir. 2007).

There are countless legitimate strategic reasons an attorney might plan out a particular theory of the case before trial yet abandon it once proceedings are underway. A competent criminal defense attorney must adjust as the

government's case unfolds and as government witnesses tell their story and experience cross examination. The need to see and experience those developments usually prevents pretrial plans from being set in stone. *See* <u>Blake v. United States</u>, 723 F.3d 870, 879 (7th Cir. 2013) ("Counsel's performance is to be evaluated in light of the discretion properly accorded an attorney to develop appropriate trial strategies according to the attorney's independent judgment, given the facts of the case, at least some of which may not be reflected in the trial record."). Concerns such as these occasionally lead experience criminal defense counsel to waive or defer opening statements.

In short, whether Mr. Simon got the defense he expected isn't at issue – the court asks only whether the defense he actually got passes constitutional muster. For this reason, the "factual disputes" that Mr. Simon believes entitle him to an evidentiary hearing don't. His affidavit and his counsel's affidavit present different stories about how and why various defense decisions were made, but resolving those disputes isn't necessary. In ruling on a § 2255 motion, the court looks at constitutional effectiveness from an "objective standard of reasonableness" – the question is whether there could have been *any* sound strategic reason for a particular act or decision, not what an attorney was actually thinking when making the choice. *See* <u>Cullen v. Pinholster</u>, 563 U.S. 170, 196 (2011) (emphasizing that <u>Strickland</u> mandates a strong presumption of reasonableness, so a court reviewing an ineffectiveness claim is "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively

entertain the range of possible reasons [counsel] *may have had* for proceeding as they did.") (internal quotation marks and citations omitted) (emphasis added); *see also* <u>Harrington v. Richter</u>, 562 U.S. 86, 110 (2011) (holding that <u>Strickland</u> "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

Mr. Simon first alleges that his counsel mistakenly thought the defense could call experts to testify as to principles of tax law, and so neglected to prepare jury instructions on the relevant legal principles. The jury therefore never heard a critical part of Mr. Simon's defense, specifically that any mischaracterization of the payments he received wasn't willful because other alternative tax treatments for the payments would have had the same result. His second claim alleges several different alleged errors by trial counsel which cumulatively impeded Mr. Simon's attempt to present his defenses to the jury.

A.    *Ineffectiveness related to Mr. Simon's proposed willfulness-based defense*

As Mr. Simon describes it, his "primary contention is that he received ineffective assistance because trial counsel failed to provide timely and adequate law to the court." In essence, he argues that he wanted to make a good-faith defense to the charge that he underreported his income on his tax returns, but his counsel made a fatal legal error that prevented him from presenting the legal basis for his planned defense to the jury.

According to Mr. Simon, counsel had always planned on a two-pronged defense to the portions of the tax fraud charges in counts 1-4 based on underreported income. First, counsel would argue that there was nothing false about the tax returns because the payments not reported as income were in fact legitimate nontaxable loans from the businesses to Mr. Simon. The argument would be that Mr. Simon honestly considered these legitimate loans, and intended to repay them. Second, counsel would argue that even if Mr. Simon was wrong to consider the payments nontaxable loans, the mistake couldn't have been willful because the payments would have been untaxable no matter how they were characterized. If the money didn't properly qualify as loans, it would have been either partnership distributions or advances on reimbursements for expenses that Mr. Simon paid on behalf of the businesses – and neither of those would have changed the tax treatment, because partnership distributions and reimbursements are both non-taxable. In other words, if the jury rejected his argument that the loans were legitimate, Mr. Simon wanted it to infer that he must not have *intentionally* lied about the payments because there would have been no tax benefit to doing so; at worst his mischaracterization of the money as loans was an honest mistake, because he would have owed no taxes on the payments no matter how they were classified. Mr. Simon emphasizes that he never intended "to present alternative or contradictory" defenses that the money was either loans *or* partnership distributions *or* expense reimbursements. Rather, he believes his attorneys should have presented the following "common

sense" question to the jury: "why would [Mr. Simon] willfully mischaracterize the money as loans, which ultimately caused him to owe significant taxes, when he could have characterized the money as a partnership distributions [sic] or even income and owed none?"

For jurors to understand and accept that defense, they'd need to know how the tax laws treat all those different categories of payments. The proper way to educate the jury about tax law principles is by submitting timely and legally correct jury instructions, not by calling expert witnesses; only the court can instruct the jury on the law, and expert witnesses can't generally testify as to what the law is or whether someone's conduct was or wasn't lawful. *See* United States v. Jungles, 903 F.2d 468, 477 (7th Cir. 1990). Mr. Simon's attorneys tried to call tax law professionals as expert witnesses, telling the court that the witnesses would opine on how the tax laws treat various types of payments and whether the payments at issue here were taxable. The court refused to permit such testimony, a holding that was upheld on appeal. *See* United States v. Simon, 727 F.3d 682, 697 (7th Cir. 2013) ("The court was correct to preclude any witness from generally explaining the law to the jury.").

After the witnesses' testimony was excluded, the only available course for Mr. Simon's attorneys was to propose jury instructions supporting his theory of defense. Because his counsel thought they could call experts instead, Mr. Simon says, they were caught off guard when the experts were excluded and didn't have time to formulate adequate jury instructions. Counsel submitted jury

instructions on how partnership distributions and expense reimbursements are treated under the tax laws, but didn't do so until the final day of trial. The court refused to give the instructions because they were untimely, and also because they were inadequate; they didn't explain to the jury how to calculate Mr. Simon's basis in JAS Partners, and without knowing Mr. Simon's basis the jury couldn't have determined whether distributions from the partnership were nontaxable. Accordingly, the jury was left without any instruction on how the tax laws applied to partnership distributions and reimbursements or expense advances, and Mr. Simon argues that this left him without a full defense.

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under <u>Strickland</u>." <u>Hinton v. Alabama</u>, 134 S. Ct. 1081, 1089 (2014). Mr. Simon believes that his attorneys made such a fundamental misstep, erroneously believing that experts could testify as to what the law is and thus squandering the chance to prevent a meritorious defense. He argues that the attorneys clearly didn't make a strategic choice to jettison the good-faith defense based on alternative characterizations of the payments as partnership distributions or reimbursements, because they *tried* to present this defense and were only prevented from doing so by their own elementary legal mistakes. He insists that his attorneys couldn't have strategically chosen to call experts to testify on the law because such experts

would obviously be excluded by the court, and they couldn't have strategically chosen to submit untimely and inadequate jury instructions.

That Mr. Simon's counsel wound up on the wrong side of an evidentiary ruling doesn't mean that they made a fundamental legal error that prevented Mr. Simon from mounting a full and reasonable defense. Counsel doesn't act deficiently simply by pushing the envelope. There is an obvious strategic logic in at least trying to admit favorable but likely inadmissible evidence, or proposing favorable but likely improper jury instructions; if successful such efforts might secure the defendant an unreviewable acquittal, and if unsuccessful there's no real cost to the defendant. Mr. Simon is certainly correct that there is never a valid strategic reason to submit untimely jury instructions as opposed to timely ones, but his argument that this mistake made his trial unfair presupposes that there was *any* legally valid way to present his chosen defense to the jury. In fact, there was not. The court wouldn't have permitted Mr. Simon's preferred good-faith defense to be presented to the jury even if his attorneys had submitted timely and correct jury instructions, because the defense Mr. Simon wanted to raise would have been wholly speculative given the evidence at trial. Even if his attorneys made a mistake by submitting jury instructions too late, this error couldn't possibly have prejudiced Mr. Simon because the instructions would have been rejected even if timely.

"A defendant is entitled to an instruction on his theory of defense only if '(1) the instruction provides a correct statement of the law; (2) the theory of

defense is supported by the evidence; (3) the theory of the defense is not part of the government's charge; and (4) the failure to include the instruction would deprive the defendant of a fair trial.'" United States v. Campos, 541 F.3d 735, 744 (7th Cir. 2008) (quoting United States v. Millet, 510 F.3d 668, 675 (7th Cir. 2007)). Mr. Simon's theory doesn't meet the second criterion, because it was wholly speculative. To convict Mr. Simon on counts 1-4, the government was required to prove only that he filed a return that he did not believe was true and correct to "every material matter." United States v. Pansier, 576 F.3d 726, 736 (7th Cir. 2009). Accordingly, the focus is on Mr. Simon's own knowledge and intent; if he characterized the money as loans and the jury found that he knew the loans weren't legitimate, it is no defense that other hypothetical characterizations of the money unknown to Mr. Simon might have been available that could have resulted in no tax liability. Wholly hypothetical or speculative mental state defenses such as the one Mr. Simon now insists his attorneys should have mounted are often raised, but routinely excluded. *See, e.g.*, United States v. Zayyad, 741 F.3d 452, 460 (4th Cir. 2014) ("If the defendant wants to present a theory or belief that might have justified his actions, then he must present evidence that he in fact relied on that theory or belief."); United States v. Curtis, 782 F.2d 593, 599 (6th Cir. 1986) ("Willfulness is personal. It relates to the defendant's state of mind. It does not exist in the abstract. Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant.").

In <u>United States v. Kokenis</u>, 662 F.3d 919 (7th Cir. 2011), the defendant controlled a number of corporations and business entities and was charged with filing false tax returns by not reporting various payments as income. <u>Id.</u> at 922-926. The defendant wanted to call tax experts to testify about an obscure "pool of capital" accounting theory under which the payments at issue could have been excluded from taxable income, and wanted to argue that the pool of capital theory "would have provided a layer of credibility to [his] argument that he did not act willfully" in characterizing the money as nontaxable. <u>Id</u>. at 929-930. The district court refused to admit this testimony and declined to give a jury instruction on good faith. The court of appeals affirmed, noting that whether the "pool of capital" theory might have been available to the defendant was irrelevant to whether he willfully filed false returns, because the "mere existence of the theory without evidence of [the defendant's] knowledge of and reliance on the theory is insufficient to support the assertion of good faith." <u>Id.</u> at 928. Because there was "no evidence that he actually relied on the pooling capital theory," the defendant's proffered evidence "would be irrelevant, confusing, and perhaps even misleading." <u>Id</u>.

Mr. Simon's situation is much the same. He wanted to argue that his failure to list the payments as income wasn't willful because several possible characterizations of the payments would have resulted in no tax liability to him. But there was no evidence that Mr. Simon relied on these alternate possible bases for escaping tax liability, and no evidence that he ever considered the

possibility of characterizing the payments as partnership distributions or expense reimbursements. A defendant "only needs to demonstrate a foundation in evidence, 'however tenuous,' to support his theory, but a 'mere scintilla of evidence ... is not sufficient to warrant a defense instruction.'" United States v. Canady, 578 F.3d 665, 672–73 (7th Cir. 2009) (quoting United States v. Buchmeier, 255 F.3d 415, 427 (7th Cir. 2001)). Not only could Mr. Simon point to nothing suggesting that he relied on the alternative income characterizations when deciding not to report the payments as income, there was affirmative evidence to the contrary. Mr. Simon consistently recorded the payments as loans in his own records, noted them as loans on the tax returns of the businesses making the alleged loans, and characterized them as loans in UCC documents and bankruptcy filings. This evidence that Mr. Simon exclusively categorized the payments as loans negates any possible inference that he might have relied on a good faith belief that the payments were something else. Like the defendant in Kokenis, Mr. Simon "seems to be asserting that just because there may be evidence to show that someone could have had a good-faith belief that he wasn't violating the law, then he should be able to present such evidence to the jury. Not so. Without any connection to his state of mind, such evidence is irrelevant." Kokenis, 662 F.3d at 930; *see also* United States v. Trudeau, 812 F.3d 578, 591 (7th Cir. 2016) ("When a defendant offers nothing but speculation to link a piece of evidence to his state of mind, the evidence is properly excluded unless the

defendant offers corroboration that the evidence *in fact* influenced his mental state.") (emphasis in original).

Moreover, there was no prejudice to Mr. Simon. The government points out that there was even less justification for treating the payments as partnership distributions or expense reimbursements than there was for treating them as loans; the loan-based defense truly was the only one with even a shadow of support in the record. It's unlikely the jury would have credited Mr. Simon's willfulness defense had it been presented to them, because the record didn't actually support characterizing the payments as the alternate forms of nontaxable transfers Mr. Simon proposes. It isn't necessary to review the problems with a partnership or reimbursement-based defense here, however, because even if Mr. Simon had presented his willfulness-based defense and the jury had credited it against all odds, he would still have been convicted on the tax fraud counts. Counts 1-4 of the indictment alleged that Simon's tax returns were fraudulent in two ways – underreporting income, and failing to disclose his interests in foreign accounts – and the jury only needed to find one willful, material falsehood to convict him on these counts. The willfulness-based argument that Mr. Simon claims was critical to his defense was only relevant to one of the two falsehoods, and would have provided no defense to the allegation that Mr. Simon's tax returns were false because they didn't disclose his foreign accounts on Schedule B of the returns.

The jury could have convicted on counts 1-4 based solely on the nondisclosure of foreign accounts and would almost certainly have done so, given that it convicted Mr. Simon of failing to file the required FBAR reports disclosing the same foreign accounts. Indeed, by convicting the FBAR counts the jury necessarily found that Mr. Simon had foreign accounts he was required to disclose. The only way the jury could have acquitted on the tax fraud counts, then, would be if jurors believed Mr. Simon's failure to disclose wasn't willful. Counts 5-8 also had a willfulness requirement, so this would have been highly unlikely; the jury would have had to find that Mr. Simon's failure to disclose his foreign accounts in the FBAR reports was willful but that his failure to disclose those accounts on his tax returns was an honest mistake. Both at trial and on appeal, Mr. Simon took the position that the Schedule B accusations and the FBAR accusations stood or fell together. *See* United States v. Simon, 727 F.3d at 698 ("Both Simon and the government treated [the Schedule B issues] as coterminous with the FBAR issue. That is, if Simon prevailed on the FBAR issue, he could prevail on the Schedule B issue. On the other hand, if he lost on the FBAR issue, he also lost on his Schedule B defense."). Because Mr. Simon lost on the FBAR issue, he would have lost on the Schedule B issue and the jury would have convicted him of tax fraud regardless of whether it believed his tax returns also understated his income.

Mr. Simon isn't entitled to relief on his "primary" claim: that his counsel's elementary legal mistakes prevented him from mounting his planned defense

that any underreporting of his income wasn't willful, because the payments would still have been nontaxable if considered partnership distributions or expense reimbursements. He wouldn't have been entitled to present his alternative tax law theories or the good-faith defense based on them to the jury regardless of what counsel had done, because there was no evidence Mr. Simon had ever actually considered or relied upon those alternate characterizations of the payments in preparing his returns. The law simply doesn't support the willfulness-based defense Mr. Simon now insists he planned to raise, so counsel's inability to present that defense to the jury couldn't have been constitutionally ineffective performance. Moreover, the jury rejected Mr. Simon's defense to the other alleged falsity on his tax returns – the failure to report foreign accounts in Schedule B. He would therefore have been convicted on the tax fraud counts in any case, and could have suffered no prejudice from his attorneys' inability to present his willfulness-based defense regarding the characterization of the payments.

B.    *Ineffective assistance related to the mail fraud charges*

Mr. Simon also argues that his attorneys provided constitutionally ineffective assistance in defending him against the mail fraud charges in the indictment. Counts 9-19[2] alleged that Mr. Simon committed mail fraud in the

---

2 The jury convicted Mr. Simon of most of the mail fraud counts, but acquitted him with regard to the three specific mailings involved in counts 13, 14, and 16.

course of sending financial aid applications to the private schools his children attended or sought to attend. The indictment alleged that Mr. Simon underreported his income on applications for need-based financial aid in the same way he underreported his income on his tax returns as alleged in counts 1-4. Mr. Simon argues that his counsel failed to adequately investigate potential defenses to these charges. He says his counsel missed two legal infirmities in the indictment that could have formed the basis for meritorious motions to dismiss the mail fraud counts. He also claims that apart from these legal arguments, his attorney neglected to locate and call witnesses that would have been favorable to the defense.

*"Money or property"*

When a claim of ineffective assistance is based on counsel's failure to present a motion, the court looks to whether the proposed motion would have been meritorious. *See* United States v. Cieslowski, 410 F.3d 353, 360 (7th Cir. 2005); Owens v. United States, 387 F.3d 607, 610 (7th Cir. 2004). The inquiry turns to whether the legal arguments for dismissal that Mr. Simon now makes would have been successful if raised in a pretrial motion to dismiss or a mid-trial motion for judgment of acquittal.

The first legal infirmity that Mr. Simon identifies concerns whether his children's private schools had a property right in the full value of tuition. To

convict Mr. Simon of mail fraud, the government needed to prove that he used the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C.A. § 1341. The "money or property" targeted by the scheme need not be physical, tangible property, <u>Carpenter v. United States</u>, 484 U.S. 19 (1987), but the victim must actually have a recognized property right in the object of the scheme at the time the fraud is committed. <u>Cleveland v. United States</u>, 531 U.S. 12, 15 (2000) ("It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim.).

Mr. Simon insists that need-based financial aid doesn't result in the transfer of any money or property from a school to a student's family; the schools use need-based aid awards to reduce the amount of tuition they would otherwise charge, so they have no cognizable "property right" in the full price of tuition. The government responds that the private schools had a property right to the full amount of tuition, and that by fraudulently pleading poverty Mr. Simon induced the schools to offer his family a hefty tuition discount.

Mr. Simon's argument blinks the fact that he isn't constitutionally entitled to a perfect defense; so long as his attorneys mounted a professionally reasonable defense, they were under no obligation to bring every conceivably colorable motion Mr. Simon can identify after the fact. As Mr. Simon himself acknowledges, "what may constitute money or property for the purpose of the

[mail fraud statute] has been the subject of numerous appellate court decisions" and "circuit court opinions vary as to when a money or property right is implicated." No controlling court opinion seems to have directly addressed whether underreporting income on financial aid forms satisfies the "money or property" element of the mail fraud statute, so to determine whether the charges against Mr. Simon should be dismissed his attorneys needed to navigate a tangled web of case law and compare his conduct to dozens of not-quite-analogous schemes. Given the imprecise contours of the "property right" requirement and the difficulty of harmonizing the cases, even an attorney who incorrectly concluded that his client's scheme fit the statute might not necessarily fall below the constitutional minimum of effective assistance. Put simply, on such complex and unsettled legal ground a professionally reasonable attorney is entitled to some room for error. That Mr. Simon can now in hindsight point to colorable legal arguments his attorneys didn't raise doesn't mean his constitutional right to counsel was violated.

In any event, Mr. Simon's counsel wasn't ineffective because his proposed legal argument isn't meritorious. He relies on Cleveland v. United States, 531 U.S. 12 (2000), for the proposition that the mail fraud statute only applies when a victim is deprived of property actually in its hands at the time of the fraud. Cleveland concerned a scheme in which the defendants made false statements to the State of Louisiana to obtain video poker licenses. The defendants were convicted of defrauding the state, but the Supreme Court held that the

convictions had to be reversed; because the defendants paid the required licensing fees and a share of their revenue to the state, the state hadn't actually been deprived of any "money or property." Id. at 22-23. The Court held that the state had only a regulatory interest in who received the licenses, not a cognizable property right for purposes of the mail fraud statute.

Cleveland differs significantly from Mr. Simon's case. Mr. Simon is right that under Cleveland, gain to the defendant isn't enough to satisfy the mail fraud statutes without a corresponding loss to the victim of something in which the victim has a property right. But unlike in Cleveland, Mr. Simon's false statements about his income deprived the private schools of something of value – the full price of tuition – that they would otherwise have received. The private schools didn't have a mere "regulatory interest" in which students received need-based financial aid, because each award of aid meant an attending student paid less than full tuition; a spot in the class allocated to a student attending for free could otherwise have been occupied by a student paying full price.

Mr. Simon's reliance on United States v. Adler, 186 F.3d 574 (4th Cir. 1999) is misplaced. Adler concerned a situation in which the defendant controlled a business that owed a debt to the victim, and that business received a large settlement payment from an unrelated suit. The defendant told the victim that he could pay the debt once the settlement proceeds came in. Realizing that he would have no money left if he used the settlement money to pay the debt, the defendant instead paid the settlement money to himself as a bonus. When

the company's creditor demanded to know where the settlement money was, the defendant provided a fraudulent list of transactions that left out the payment to himself. The Fourth Circuit held that while the creditor had a legitimate right to payment of the debt, it had no property right in the particular money the defendant received from the unrelated settlement because the defendant never promised to pay the debt with those specific proceeds. Id. at 579-580. Mr. Simon misreads Adler as holding that a defendant's promise to pay a debt isn't enough to create a property right in the creditor to whom the promise is made. The Adler court didn't reach that question at all because it explicitly found that no such promise existed. Id. at 578 ("Mr. Adler did undoubtedly tell Printgear that Adler Industries would be able to pay Printgear after it received the settlement … But such a claim by Mr. Adler is a far cry from a promise to Printgear of that particular money, and the record reveals that no such promise was ever made."). In any event, the relevance of Adler isn't clear; there is no dispute here about whether the schools were entitled to any particular *source* of funds, only whether they were entitled to full tuition from someone who falsely claimed eligibility for a discount.

Mr. Simon insists that nothing entitled the school to the full amount of tuition payment. Because the school offered price discounts to some families, he argues, the school couldn't have had a property interest in the full amount of tuition; it only acquired an entitlement to the amount of tuition actually agreed upon *after* the need-based aid was awarded. The available authority belies that

argument: the relevant cases hold that a defendant who uses fraud to avoid paying the full amount due for a good or service deprives the victim of property within the meaning of the mail fraud statute.

In Pasquantino v. United States, 544 U.S. 349 (2005), the Supreme Court held that defendants committed fraud[3] when they devised a scheme to smuggle liquor out of Canada without paying excise taxes. The Court noted that "[t]he right to be paid money has long been thought to be a species of property," so avoiding paying the taxes was no different than stealing money directly from the Canadian treasury. Id. at 355-356 (internal citations and quotation marks omitted). The private schools Mr. Simon's children attended had a right to be paid money – children attending the schools were obligated to pay tuition. Mr. Simon made fraudulent statements to the schools to avoid paying the full amount due, and in so doing he deprived the schools of property in the form of their right to payment for the educational services they provided.

Persuasive authority from other circuits concerning even more closely analogous circumstances uniformly holds that a defendant who lies about his eligibility for a discount deprives his victim of a property right in the full price of the good or service bought. In United State v. Ali, 620 F.3d 1062 (9th Cir. 2010),

---

[3] Technically wire fraud, but the wire and mail fraud statutes use identical language (aside from the jurisdictional element) and decisions based on one are commonly consulted in interpreting the other. See United States v. Turner, 551 F.3d 657, 666 n.4 (7th Cir. 2008) ("Cases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute.").

the Ninth Circuit held that buyers deprived a software seller of property when they lied about their eligibility for a discount. The court held that the seller "had a right to full payment for its software and was deprived of that right when Defendants fraudulently obtained the software for less than full payment." Id. at 1067. Similarly, in United States v. Stewart, 872 F.2d 957 (10th Cir. 1989), the defendants lied about how they intended to distribute drugs to get a discount from the drug wholesaler. The court held that obtaining the fraudulent discount deprived the seller of property, because "the effect of the scheme was to deprive the manufacturers of money which they should have received" on the sale. Id. at 960. Just like the victims in Ali and Stewart, the private schools in this case established particular criteria a customer had to fulfill in order to obtain a price discount. And just like the defendants in those cases, Mr. Simon misrepresented that he met those criteria in order to obtain a price concession to which he wasn't legitimately entitled.

Mr. Simon tries to distinguish Ali by pointing out that in that case, the defendant and the victim had a contract before the fraud that entitled the victim to payment. He emphasizes that he had no similar contract with the private schools, and that the entitlement to money that forms the basis of a protected property right must come from a contract or statute. But the reasoning in Ali made no mention of the prior contract, relying instead on common law entitlements of a seller to payment. Mr. Simon's argument that a contract or statute is necessary to create a property right seeks to import into the case law

limitations that don't appear in it. He also tries to distinguish Stewart based on its age, suggesting that its reasoning depended partly on the gain to the defendant and that Cleveland later held that such gain to a defendant alone can't support a mail fraud conviction. Mr. Simon misreads Stewart. Its reasoning doesn't hinge on gain to a defendant alone, but rather on the fact that falsely representing one's eligibility for a discount is intended to "gain money or property at the expense of the victim." United States v. Stewart, 872 F.3d at 960. It is precisely this deprivation of the victim's property that the mail fraud statute punishes. Stewart remains good law, its reasoning is persuasive, and its factual circumstances are so close to Mr. Simon's that it is fatal to his argument that his particular misstatements were outside the scope of the mail fraud statute.

For these reasons, Mr. Simon's misrepresentation of his financial status to his children's private schools deprived the schools of "money or property" under the mail fraud statutes and a motion to dismiss the mail fraud counts on that basis would have failed. Mr. Simon's attorneys weren't constitutionally ineffective in deciding not to bring a meritless motion to dismiss.

*Timing of the mailings*

The other argument Mr. Simon thinks should have been raised in a pretrial motion directed at some of the mail fraud charges concerns the timing of the mailings at issue. Counts 9-12 of the indictment concerned one particular private school, Canterbury School in Fort Wayne, Indiana. Three of Mr. Simon's

children attended Canterbury for the 2004-2005 school year, and Mr. Simon applied for need-based financial aid on behalf of all three. Mr. Simon's financial aid applications were demonstrably false in a number of respects, including reporting that he spent no money on clubs or vacations the prior year when he was actually a dues-paying member of numerous expensive country clubs and had taken a vacation to Disney World. The mailings charged in counts 9-12 weren't the fraudulent financial aid applications, but rather the year-end billing statements confirming financial aid awards for each child that Canterbury mailed to Mr. Simon after the school year ended. Mr. Simon argues that if his attorneys had investigated further, they would have discovered that the statements were mailed at the end of the 2004-2005 school year and so came *after* the alleged fraud was complete and played no role in furthering it.

Mr. Simon isn't really complaining about evidence that could have been located but wasn't; he simply wishes his attorneys had mounted a particular defense that they chose not to. The only thing Mr. Simon says would have been revealed by more "investigation" was the date of the mailings relative to the posting of financial aid awards. No investigation is needed to know that schools award financial aid at the beginning of the school year, and it seems unlikely that Mr. Simon's large team of lawyers and investigators all remained wholly ignorant of the fact that the end-of-year billing statements charged in the indictment were mailed at the end of the year. Mr. Simon's real claim seems to be that his lawyers were constitutionally ineffective in not moving to dismiss the

Canterbury charges based on the timing of the mailings.

Again, nothing in the constitution required Mr. Simon's counsel to make every conceivably colorable argument. Counsel reasonably chose to defend the mail fraud charges on materiality grounds, arguing that because the schools wanted Mr. Simon's academically gifted children to enroll, they were willing to make price concessions and told Mr. Simon that the financial information he put down in the applications wouldn't really matter. This wasn't an indefensible choice; that school officials didn't consider themselves defrauded and in fact continue to support the Simon family could certainly have convinced a jury that the government was overreaching with these particular charges. In contrast, moving to dismiss because of the timing of the mailings would risk wasting valuable trial preparation time briefing a complex legal issue – time that could otherwise have been spent working on issues that didn't concern only a tiny fraction of the government's case against Mr. Simon.

Regardless, Mr. Simon's claim – whether viewed as an attack on his lawyers' strategic choices or as a criticism of the scope of their investigation – falls apart for the independent reason that a motion to dismiss the charges based on the timing of the mailings wouldn't have succeeded. The mail fraud statute doesn't punish a scheme to defraud per se, but rather punishes use of the mails "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C.A. § 1341. Even an innocent, routine mailing by a third party containing no false statements itself can satisfy the statutory mailing element, provided that

the mailing was part of the scheme as contemplated by the schemer. *See* Carpenter v. United States, 484 U.S. 19, 28 (1987); Parr v. United States, 363 U.S. 370, 390 (1960). The mailing at issue need not itself be an essential element of the scheme, but must be at least "incident to an essential part of the scheme," Pereira v. United States, 347 U.S. 1, 8 (1954), or "a step in [the] plot," Badders v. United States, 240 U.S. 391, 394, (1916). Even a mailing that occurs after the money or property targeted by the scheme has been received can fall within the scope of the statute, if it helps to conceal the fraud from detection or facilitates an ongoing scheme. *See* Schmuck v. United States, 489 U.S. 705, 711-712 (1989).

Mr. Simon emphasizes that the billing statements came in June 2005, after the 2004-2005 school year had ended and financial aid had already been awarded. He insists that the statements did nothing to conceal the scheme or make a later step in the scheme possible; they simply confirmed that no money was due on the accounts of Mr. Simon's children. While Mr. Simon is correct that financial aid had already been fully paid out for the 2004-2005 year by the time these mailings occurred, he takes too narrow a view of the fraudulent scheme. As the government notes, Mr. Simon's children continued to attend Canterbury for years after the 2004-2005 academic year.[4] Getting confirmation

---

[4] Mr. Simon initially argued that his children never returned to Canterbury after 2004-2005, so there was no ongoing scheme for the mailings to further after he received the 2004-2005 financial aid. He abandons this argument in his reply brief, admitting that his children continued to attend Canterbury.

from the school that he owed no money at the end of the academic year proved to Mr. Simon that he had gotten away with it; a full year after the financial aid applications, Canterbury remained unsuspecting of his true financial status. "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time," even if the mailing later proves to be documentation of the fraud that comes back to bite the schemer. Schmuck v. United States, 489 U.S. 705, 715 (1989). The billing statements reassured Mr. Simon that he remained in the school's good graces, and because he hoped to continue sending his kids there (and would fill out further financial aid applications to do so), a rational jury could have found that the mailings were part of the scheme as conceived by Mr. Simon. Mr. Simon's attorneys were accordingly not ineffective in declining to bring a motion to dismiss based on the timing of the mailings in counts 9-12.

*Mr. Turnbull's testimony*

Mr. Simon's final claim about his mail fraud counts is that had his attorneys more thoroughly investigated the charges against him, they would have identified and called Michael Turnbull as a witness. Mr. Turnbull was the director of admissions at Culver Academies, another private school Mr. Simon's children attended, and oversaw the school's financial aid committee during the years in question. Mr. Simon presents an affidavit from Mr. Turnbull, in which

Mr. Turnbull says he doesn't recall Mr. Simon's investigators or attorneys contacting him and was never asked to testify as a witness at trial. Mr. Turnbull also states that Culver exercises discretion in awarding financial aid and uses it as a tool to offer price concessions, that when asked by parents about how to fill out spending information on the applications Mr. Turnbull would tell them to give their best guess, and that he sometimes encouraged parents to write "0" on the part of the forms asking how much the family could pay or to leave that question blank. Mr. Simon argues that had his attorneys interviewed Mr. Turnbull, Mr. Turnbull would have corroborated certain elements of Mr. Simon's general defense that (1) his answers on the financial aid application weren't materially false because the school doesn't care much about those answers, and (2) he filled out the forms exactly as the school directed him to.

An attorney representing a criminal defendant has a duty to make "some investigation into the prosecution's case and into various defense strategies" or to "make a reasonable decision that makes particular investigations unnecessary." Brown v. Sternes, 304 F.3d 677, 691 (7th Cir. 2002) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)). Accordingly, whether an attorney's decision not to investigate a particular witness constitutes ineffective assistance depends on factors such as "counsel's overall diligence, the likely relevance of the witness's testimony, whether alternative ways of proving the point exist, and the strength of the government's case." United States v. Best, 426 F.3d 937, 945 (7th Cir. 2005). As Mr. Simon's own affidavit shows, his

counsel conducted an extensive investigation that included interviewing the many people who had been interviewed by government agents. Critically, his attorneys interviewed Scott Joyner, Culver's director of financial aid, four times before trial. Because Mr. Joyner sat on Culver's financial aid committee and was familiar with Mr. Simon's specific case, Mr. Simon's attorneys could very reasonably have determined that a fishing expedition for other Culver employees who might have relevant testimony wasn't an efficient use of their time. Even if Mr. Simon's attorneys had missed a more favorable Culver witness, that doesn't mean that the decision not to interview other Culver employees was unreasonable.

Moreover, even if the limited investigation of Culver employees constituted deficient performance, Mr. Simon hasn't met his burden of proving prejudice. A defendant raising an ineffective assistance of counsel claim regarding the failure to call a witness is only entitled to relief on such a claim if he makes a specific, affirmative showing as to what the missing evidence would have been, United States ex rel. McCall v. O'Grady, 908 F.2d 170, 173 (7th Cir. 1990), and proves that the witness's testimony would have produced a different result, United States ex rel. Cross v. DeRobertis, 811 F.2d 1008, 1014 (7th Cir. 1987). Mr. Turnbull's testimony, as reflected in his affidavit, falls far short of that showing. Mr. Turnbull says he can't recall anything about what he did or didn't discuss with Mr. Simon, and offers only general testimony about what he sometimes told other parents. He doesn't say that he gave Mr. Simon specifically any

instructions at all on how to fill out the aid applications. Mr. Simon complains that if interviewed at the time of trial Mr. Turnbull's memory might have been clearer, but it is Mr. Simon's burden of showing that testimony favorable to him wasn't presented. A petitioner who claims his attorney's failure to investigate violated his Sixth Amendment rights must "provide the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced." <u>Richardson v. United States</u>, 379 F.3d 485, 488 (7th Cir. 2003). Mr. Simon's speculation that an uncalled witness might have been able to corroborate his story isn't enough to meet the exacting standards for habeas relief.

In addition, even if Mr. Turnbull testified at trial and recalled giving Mr. Simon instructions on how to fill out the aid forms, that testimony wouldn't have materially changed the outcome on the mail fraud counts. Even if Mr. Turnbull had told Mr. Simon to give a "best guess" as to his spending and encouraged him to write "0" for the amount of tuition he could pay, that wouldn't excuse Mr. Simon from making specific false statements about his financial situation (such as complaining of phantom "major business failures"). The jury heard a wealth of evidence from which it could conclude that Mr. Simon's financial aid form responses were not his "best guess" as to the previous year's spending, given the wholesale disconnect between his actual lifestyle and his answers on the application. To the extent that Mr. Simon wanted to call Mr. Turnbull to testify that Culver wanted his children to attend and was willing to make concessions

to ensure that, the jury already heard such evidence from other witnesses.

Mr. Simon can't show either that his counsel's decision not to interview Mr. Turnbull was unreasonable nor that it prejudiced his defense.

### C. Ineffective assistance related to the Schedule B filing requirements

Next, Mr. Simon claims that his attorneys were ineffective in failing to investigate the filing requirements related to reporting foreign accounts on a tax return. Counts 1-4 of the indictment alleged that Mr. Simon filed false tax returns for the years 2003-2006. One of the ways the government argued Mr. Simon's returns were false was that Mr. Simon hadn't checked the "yes" box on Line 7a of IRS form 1040 Schedule B, which asks whether the filer has control over foreign financial accounts. Mr. Simon argues that his counsel was unaware that Line 7a doesn't simply ask if the filer has control over any foreign account; rather, it asks whether the filer has control over one or more accounts with a combined value exceeding $10,000. Had his attorneys adequately investigated this requirement, Mr. Simon argues, they would have requested jury instructions concerning the $10,000 limit. The jury instructions actually given at trial didn't inform the jury that they had to find Mr. Simon's accounts totaled over $10,000 to find that his not checking "yes" on the Schedule B forms was a falsehood. Alternately, Mr. Simon argues that if his attorneys were aware of the filing requirement they could have moved to dismiss based on a lack of proof that the accounts held over $10,000.

Given that Mr. Simon's responses on the Schedule B forms wouldn't have been false if his accounts totaled under $10,000, it was professionally unreasonable not to ensure that the jury was instructed on that point. But Mr. Simon isn't entitled to relief because he can't show prejudice from counsel's error. For three of the four years at issue, the government proved at trial that Mr. Simon's accounts *did* exceed $10,000 – no rational jury could have found otherwise, and a motion to dismiss those counts would have been dead in the water. Notably, the jury instructions for counts 5-8 (concerning Mr. Simon's failure to file FBAR reports for the foreign accounts) did include the $10,000 requirement, so in convicting Mr. Simon on those counts the jury necessarily found that his accounts met the minimum balance. And while the jury instructions didn't mention the $10,000 limit specifically, the jury was still well aware of that limit; the government offered as an exhibit the IRS instructions for Schedule B, which clearly state that a taxpayer can check "no" on Line 7a if the combined value of the foreign accounts is under $10,000. The government's closing argument explicitly directed the jury to consult these instructions during deliberations.

For 2004, the situation is different. The government concedes that there was no evidence that Mr. Simon's accounts met the minimum balance in that year – in fact, the government agreed to dismiss the 2004 FBAR count on that basis. Once the government made that admission, there was no excuse for Mr. Simon's attorneys not moving to dismiss count 2 (the 2004 Schedule B count)

on the same basis; as both sides maintained throughout trial, the Schedule B and FBAR issues for each year stood or fell together. Still, the court agrees with the government that this error was a minor one in the context of the entire trial. No attorney is perfect, and the Sixth Amendment doesn't entitle Mr. Simon to a flawless defense. His attorneys vigorously put the government to its burden of proof on every charge, and mounted colorable defenses on every issue. That they missed a clear winning argument on an issue relating to one part of a single count in a complex 23-count trial doesn't mean they fell so far below professional standards of reasonableness that they weren't functioning as counsel within the meaning of the Sixth Amendment.

More importantly, Mr. Simon ignores that count 2 alleged two falsehoods on the tax return: checking "no" on Schedule B and underreporting income. Even had his attorneys noticed the $10,000 issue as to the 2004 Schedule B and successfully moved to dismiss, it wouldn't have resulted in dismissal of count 2 entirely because the allegations about income underreporting would survive. Mr. Simon could still be convicted on count 2 if the jury found that he underreported his income on his 2004 tax return. Mr. Simon's defense to the income underreporting for 2004 was exactly the same as his defense to the alleged underreporting in every other year: he argued that the money he received constituted loans and didn't need to be reported. The government's evidence was strong that the money Mr. Simon considered loans actually wasn't. And the jury convicted Mr. Simon on every other count that depended on his misrepresenting

his financial status, so it would be somewhat bizarre for the jurors to decide the payments from the 2004 returns were legitimate untaxable loans but all the other purported loans in the case were fraudulent.

There simply isn't a reasonable probability that the jury would have acquitted Mr. Simon on count 2 even if his attorneys had succeeded in getting the Schedule B allegations to that count dismissed, because the jury would have found that Mr. Simon's 2004 tax return was false in underreporting his taxable income. Even if his attorneys provided ineffective assistance by not investigating the filing requirements of Schedule B, Mr. Simon hasn't carried his burden of showing that such a deficiency prejudiced him.

### D.    Ineffective assistance related to the TurboTax program

Mr. Simon next claims that his attorneys conducted an inadequate investigation of the workings of the TurboTax software that Mr. Simon used to prepare his tax returns. As already discussed, counts 1-4 alleged that Mr. Simon didn't disclose his control of foreign financial accounts totaling over $10,000 on Line 7a of Schedule B to the tax forms. Mr. Simon had such accounts, and for three of the four years charged his accounts met the $10,000 threshold requiring disclosure. Accordingly, his only available defense concerned his mental state: he didn't realize he needed to disclose the accounts, and failed to check "yes" on Line 7a purely by mistake.

According to Mr. Simon, he used a computer program called TurboTax to

prepare his tax returns for the years in question. He says he told his attorneys before trial that he didn't think TurboTax asked him about foreign accounts and so didn't prepare a Schedule B form for him. His attorneys subpoenaed a TurboTax representative to talk about what the version of the program Mr. Simon used would and wouldn't have asked a user when automatically filling in Form 1040, but apparently TurboTax never responded and no representative testified at trial. Mr. Simon insists that had his attorneys diligently followed up, a TurboTax representative could have testified in support of Mr. Simon's defense that the program didn't automatically prepare a Schedule B form because he never reported over $1,500 in interest income. Alternatively, his attorneys could simply have asked an expert witness to recreate Mr. Simon's 2003-2006 tax returns using the versions of TurboTax from those years. He believes his attorneys provided ineffective assistance when they didn't diligently pursue and develop his TurboTax-based defense.

The decision by Mr. Simon's counsel not to go into greater depth on the TurboTax program was very reasonable. The evidence Mr. Simon says should have been presented actually might have been fatal to his willfulness defense. The expert affidavit he attaches to his § 2255 motion makes absolutely clear that had he answered the programs' questions truthfully, it would have prepared a Schedule B form and asked him about foreign accounts. This is so because there are two independent things that prompted TurboTax to print a Schedule B form: a user reporting over $1,500 in interest income *or* the user answering "yes" to

questions about whether the user "[had] an interest in a foreign account" (in the 2003-2005 version of TurboTax) or "owned or signed on a foreign bank or broker or other financial account" (in the 2006 version). The evidence at trial clearly established that Mr. Simon had interests or signature authority over such foreign accounts; even now he doesn't claim that he could have truthfully answered "no" to those questions. Had he answered those questions truthfully, TurboTax would have prepared a Schedule B form asking about the accounts regardless of the amount of interest income Mr. Simon reported. [5] His attorneys reasonably decided not to press the issue and stopped investigating the workings of TurboTax. When an attorney begins investigating an issue and correctly surmises that it won't come out in his client's favor, that attorney's decision to cease the investigation is itself a strategic choice entitled to deference.

Even if Mr. Simon's lawyers could be said to have been professionally unreasonable in not following up on the subpoena to the TurboTax representative or having an expert recreate the returns, the error didn't prejudice Mr. Simon. First and foremost, the jury *heard* this defense. Evidence was presented that Mr. Simon used TurboTax, and one of Mr. Simon's expert witnesses testified that if an individual doesn't report $1,500 of interest income in a particular year, "TurboTax doesn't even print out the Schedule B." The jury

---

[5] Mr. Simon's only response on this point is that "any questions regarding an interest in a foreign account, distribution from a foreign trust, or owning or signing on a foreign account are asked at a different time in a catchall list of questions that are unrelated to interest income." That is of course irrelevant; whenever the program asked the questions, Mr. Simon had an obligation to answer them truthfully.

had Mr. Simon's tax returns for the years in question, and could readily see that he didn't report over $1,500 in interest income for any of the years between 2003 and 2006. While Mr. Simon's attorneys didn't emphasize the defense by asking an expert to actually recreate Mr. Simon's tax returns with the program, they nonetheless presented every necessary piece of the defense to the jury; the government even made clear in its closing argument that Mr. Simon's defense to the Schedule B issue was that TurboTax didn't print out Schedule B's for him. Mr. Simon complains that his attorneys didn't emphasize this defense enough, but doesn't identify any specific part of the defense that wasn't actually presented.

The aborted investigation into a possible TurboTax-based defense didn't constitute ineffective assistance of counsel, and even if it did there was no conceivable prejudice to Mr. Simon. Mr. Simon insists he is entitled to an evidentiary hearing on this issue, but doesn't identify any factual disputes whatsoever on this point so no hearing is necessary.


### E.    Ineffective assistance related to Mr. Simon's testimony

Lastly, Mr. Simon complains about the decision that he wouldn't testify at trial. Mr. Simon suggests several pieces of evidence that he claims could only have come in through his own testimony, and several pieces of evidence admitted at trial that he claims could only have been rebutted by his testimony. Through an affidavit attached to his motion, Mr. Simon relates in detail his recollection of

how he and his attorneys discussed the prospect of Mr. Simon testifying. He identifies two errors that he believes constituted ineffective assistance: (1) his attorneys didn't adequately prepare him and didn't call him as a witness, and (2) they never explicitly informed him that the decision whether to testify was his alone.

Anthony LaSpada, Mr. Simon's lead defense counsel, submitted his own affidavit disputing essentially all the allegations in Mr. Simon's affidavit about how the defense team approached the possibility of Mr. Simon testifying. One expert and one investigator who were both part of Mr. Simon's defense team also submitted affidavits that generally corroborate Mr. LaSpada's story and refute Mr. Simon's. Mr. Simon believes these factual disputes necessitate an evidentiary hearing.

Mr. Simon isn't entitled to a hearing, for two reasons. The first is that a habeas petitioner can't ensure himself an evidentiary hearing simply by providing an affidavit saying that his lawyer stopped him from testifying. "[T]his barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed." Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991). Because of the ease of making such a claim and the waste of judicial resources that would occur if every defendant were entitled to a hearing by saying the magic words "my lawyer kept me off the stand," pragmatic considerations require that someone other than the

defendant back up his story. *See* id. (holding that "some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify" in order to "give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.").

Second, even taking his version of events as true, he isn't entitled to relief. With regard to Mr. Simon's argument that his counsel was constitutionally ineffective for not preparing him to testify and not calling him as a witness, Mr. Simon asserts that: (1) he and his attorneys initially planned for him to take the stand; (2) his attorneys spent no time preparing him to testify; and (3) on the morning of the last day of trial, his attorneys told him they didn't want to call him to testify and gave reasons. The decision about whether Mr. Simon would testify was his alone; his attorneys couldn't have prevented him from testifying and couldn't have forced him to testify against his will. To the extent that Mr. Simon is challenging not the decision to avoid calling him but rather the extent to which his attorneys prepared him for his testimony, whether they prepared him was irrelevant because he chose not to testify. Mr. Simon doesn't assert in his affidavit or his § 2255 motion that the alleged inadequacy of the preparation influenced his decision not to take the stand, so whether his attorneys spent enough time going over his testimony with him is a moot point.

Mr. Simon admits in his affidavit that his attorneys discussed the prospect of Mr. Simon testifying, and explained that having him testify would be a bad idea. He recalls them giving him two reasons for that recommendation: that the

trial judge "did not like" him and that if he testified he risked an obstruction of justice enhancement at sentencing. Accurate or not, those are exactly the kind of strategic considerations <u>Strickland</u> insulates from hindsight review. And there were many other excellent reasons his attorneys may have had for advising Mr. Simon not to take the stand. Chief among these was that a federal judge in a separate bankruptcy proceeding had made several formal findings that Mr. Simon's testimony wasn't credible. The trial court might have allowed the government to cross-examine Mr. Simon about those findings. *See* <u>United States v. Dawson</u>, 434 F.3d 956, 959 (7th Cir. 2006). Reasonable counsel could certainly have concluded that Mr. Simon's testimony wasn't worth the risk that the jury would hear about a federal judge essentially calling Mr. Simon a liar.

The second facet of Mr. Simon's claim – that he is entitled to relief because his attorneys never let him know that the decision to testify was his alone – fares no better. For one thing, it is belied by Mr. Simon's own affidavit. He admits that his attorneys told him he had the right to testify. While he insists that he misinterpreted this statement (believing it meant that the government couldn't prevent him from testifying, but his own lawyer still could), he doesn't allege that his attorneys actually said anything that could be fairly construed as suggesting that interpretation. Mr. Simon's attorneys can't be blamed for assuming a client as educated and worldly as Mr. Simon would understand a clear statement in plain English that he had the right to testify. Mr. Simon also admits that on the last day of trial, his attorney asked him whether he would testify. Even if Mr.

Simon wrongly believed that he had no choice before that, the question alone should have sufficed to correct his thinking. Mr. Simon tries to explain why he didn't infer from this question that the choice was his to make, but his explanations are too weak to warrant discussion. Even taking his affidavit as true, Mr. Simon's attorneys said enough to put him on notice that it was up to him whether to testify in his own defense.

Finally, failing to inform an client of the right to decide whether to testify doesn't fall below an objective standard of reasonableness. Mr. Simon concedes in his motion that "[t]he Seventh Circuit has indicated that the failure to inform a defendant that the right to testify is his alone is not ineffective assistance of counsel." He is correct. *See* <u>Taylor v. United States</u>, 287 F.3d 658, 661 (7th Cir. 2002) ("There may be a factual dispute about whether counsel told [the defendant] in so many words that the accused alone makes the decision whether to testify, but this dispute is not material."). Mr. Simon argues that other courts of appeal have held otherwise, and suggests that they take the better position. But the law of this circuit governs decisions by this court, and this court lacks the power to overrule opinions by the court of appeals.

Accordingly, Mr. Simon's attorneys didn't provide ineffective assistance regarding Mr. Simon's decision whether to testify. Because Mr. Simon hasn't identified any material factual dispute, he isn't entitled to an evidentiary hearing.

III. Conclusion

For these reasons, the court DENIES Mr. Simon's § 2255 motion to vacate his sentence (Doc. No. 194). Moreover, because Mr. Simon hasn't made a substantial showing of the denial of a constitutional right, the court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

SO ORDERED.

ENTERED:  July 5, 2016


/s/ Robert L. Miller, Jr.
Judge
United States District Court